F I L E D
United States Court of Appeals
Tenth Circuit

AUG 21 2001

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENET CIRCUIT

JACKIE EUGENE HUMPHREYS,

Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

Respondent-Appellee.

No. 00-7061

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-98-568-S)

Chris Eulberg, Eulberg Law Offices, Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **SEYMOUR** , **BALDOCK** , and **MURPHY** , Circuit Judges.

**BALDOCK** , Circuit Judge.

Petitioner-appellant Jackie Eugene Humphreys appeals the denial of habeas relief, *see* 28 U.S.C. § 2254, from his Oklahoma death sentence. A jury convicted Humphreys of first degree malice aforethought murder, resulting from the 1987 stabbing death of his estranged common law wife. The Oklahoma Court of Criminal Appeals affirmed the conviction, but remanded for a new capital sentencing proceeding because the trial court had failed to instruct the jury on the life-without-parole sentencing option. *Humphrey*[1] *v. State*, 864 P.2d 343 (Okla. Crim. App. 1993). In this appeal, Humphreys challenges only that 1995 resentencing, arguing 1) his attorney provided ineffective representation; 2) evidentiary errors warrant habeas relief; and 3) Oklahoma's aggravating factor applicable to individuals who murder while serving a "sentence of imprisonment" is unconstitutionally vague and overbroad. We affirm.

**I.    *Ineffective sentencing representation.*** Humphreys claims his attorney should have investigated and presented at resentencing additional, better prepared psychiatric evidence, as well as evidence that Humphreys aided an injured jail guard. To warrant habeas relief, Humphreys must establish both that counsel's performance was deficient and Humphreys' defense was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, we need only focus on

---

[1] The record refers to petitioner as both Humphrey and Humphreys. The various published opinions reflect this confusion.

-2-

the prejudice inquiry.    *See id.*  at 697.  Applying   *Strickland* , the state appellate court held that Humphreys had failed to establish that any deficient representation had prejudiced his defense.    *Humphreys v. State*  , 947 P.2d 565, 578 (Okla. Crim. App. 1997).  This determination was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.    *See*  28 U.S.C. § 2254(d)(1).

In this capital sentencing context, the relevant prejudice inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."    *Strickland* , 466 U.S. at 695.  In making this determination, we consider the strength of the State's case, the aggravating factors the jury found, and the mitigating evidence defense counsel did present at resentencing, as well as any additional mitigating evidence defense counsel could have presented. *See, e.g., Walker v. Gibson*   , 228 F.3d 1217, 1234 (10th Cir. 2000),    *cert. denied* , 121 S. Ct. 2560 (2001).

At the 1995 resentencing, the State charged, and the jury found, three aggravating factors: 1) Humphreys had previously been convicted of a violent felony; 2) he was serving a felony prison sentence at the time of the murder; and 3) he was a continuing threat to society.  As to the first and second aggravators, undisputed evidence established both that Humphreys had previously suffered an

assault and battery conviction and was on house arrest for that conviction at the time of the murder.

In addition, the State's evidence supporting the continuing threat aggravator included the following: Humphreys and the victim, Bessie Phipps, had had a violent and turbulent relationship. Humphreys had once threatened to kill her if she ever left him and he admitted that, on occasion, he had "roughed up" Ms. Phipps. Several witnesses further testified to seeing Ms. Phipps on several occasions with bruises and black eyes. Humphreys, who had previously been married several times, also admitted having hit his other wives.

In 1986, Humphreys beat Ms. Phipps' former boyfriend with a shovel handle and stabbed him with a screwdriver, resulting in the assault and battery conviction. Three months later, in September 1986, Oklahoma officials released Humphreys to house arrest. Humphreys returned to prison in November 1986, after Ms. Phipps filed assault charges against him. According to Humphreys, he voluntarily turned himself in at this time because he was afraid he would kill Ms. Phipps. Upon his next release to house arrest, on December 18, 1986, thirteen days before the murder, he and Ms. Phipps remained separated.

An acquaintance testified that, for several days preceding the murder, Humphreys would sharpen his knife and alternately profess his love for Ms. Phipps and then threaten "to rip her all to pieces," Resentencing Tr. vol. III at

414. On New Years Day 1987, Humphreys called a friend's house and Ms. Phipps answered. He professed his love to her, after which she purportedly laughed. He then went to the friend's home looking for Ms. Phipps. There, Humphreys threatened several individuals with a knife, cut the telephone line and took the friend's car. He then drove to the Cuban Bar, where he found Ms. Phipps and stabbed her five times. As police took him into custody, he stated that he had meant to do this to her, he was glad he had done it, he hoped she died, *see id.* at 481-82, 506, and that if police would "turn him loose . . . he would finish the job," *id.* at 489. Ms. Phipps bled to death on the way to the hospital. While in jail after Ms. Phipps' murder, Humphreys planned to escape and kill three men with whom he believed Ms. Phipps had had sexual relations.

In addition to these facts underlying Humphreys' murder conviction, other evidence indicated the following: In 1985, during a routine traffic stop, Humphreys punched a police officer, breaking his nose, ripped the officer's radio out of his patrol car and tried to grab the officer's revolver. When that same officer was called into Humphreys' neighborhood in 1986, Humphreys stood on his porch, yelling the officer's name and making stabbing motions with a butcher knife. While in jail after Ms. Phipps' murder, Humphreys got into a fight in 1987, "menaced" another inmate in 1988, and possessed a homemade knife in 1993. Several prison officials also testified they believed Humphreys presented a

threat to act violently in the future. Based on this evidence, the jury found Humphreys was a continuing threat to society. Strong evidence, therefore, supported all three aggravating factors.

At resentencing, the defense did prepare and present mitigating evidence to counter these aggravators. A jail guard, who was also Humphreys' longtime acquaintance, testified that he had seen Humphreys a few hours before the murder. At that time, Humphreys was either drunk or on drugs and was crying and scared because he had lost everything and did not know what he was going to do. This guard also testified that, while in jail, Humphreys would voluntarily remain locked down in his cell in order to avoid altercations with other inmates.

And Humphreys' sister and niece testified concerning Humphreys' background, including his numerous back surgeries when he was a teenager and the resulting need for strong pain medication, his excessive drinking and drug usage, and his mean and abusive disposition when he drank. In addition, evidence indicated Humphreys had two children, served in the Marines Corps, had held various jobs driving trucks and had operated a tire repair service. Humphreys testified he is an alcoholic and has struggled all his life with drugs and alcohol. Several witnesses testified to Humphreys' remorse for killing Ms. Phipps, including his two suicide attempts after jail officials told him she had died, and

the support and aid Humphreys had provided other inmates during his incarceration.

Dr. Ferguson, Ph.D., testified that Humphreys suffers from major depression, severe alcohol abuse and a borderline personality disorder. His personality disorder makes him unable to handle strong emotions or to form long-term relationships, and causes obsessive and erratic behavior. Dr. Ferguson also testified that Humphreys had been affected by, among other things, the fact that his grandfather had raped him when he was a small child; he had a cystic growth from his tail bone, for which his schoolmates ridiculed him; an adult gave Humphreys moonshine when he was fifteen and, during that episode, Humphreys got drunk and pointed a gun at a police officer who had been summoned to break up a fight; as a result, Humphreys spent time in a juvenile boys' home, where he was frequently beaten; and, after his mother's death, relatives told Humphreys his father was not his biological parent. According to Dr. Ferguson, Humphreys possesses average intelligence, is creative and sensitive, and very remorseful for the murder.

Humphreys now asserts that his defense attorney should have also presented mitigating evidence concerning his aiding an injured jail guard. The guard, as he was unlocking a cell occupied by two belligerent inmates, either slipped or was pushed, fell and broke his leg. The testimony concerning the extent to which

Humphreys aided this guard was controverted. Following an evidentiary hearing, the state trial court found that the evidence "was conflicting and did not show an 'heroic' action on [Humphreys'] part[;] rather, he helped but did not rush into harm[']s way . . . ." Post-conviction O.R. at 98. Even viewing the conflicting evidence most favorably to Humphreys, it established only that Humphreys kept the two belligerent inmates inside their unlocked cell until he could shut the door and then help carry the guard to safety. While this evidence is mitigating, *see Williams v. Taylor*, 529 U.S. 362, 396 (2000), there is no reasonable probability that, had defense counsel presented this testimony, at least one juror would have voted against imposing a death sentence, in light of the facts of Ms. Phipps' murder itself, the three well-supported aggravators, and Humphreys' past violent conduct.

Humphreys further asserts that his attorney should have obtained and presented additional psychiatric evidence indicating that he has suffered brain damage. Dr. Philip Murphy, Ph.D., a neuropsychologist, and Dr. Shreekumar Vinekar, M.D., a psychiatrist, testified at a state post-trial evidentiary hearing. Like Dr. Ferguson, both these doctors thought Humphreys suffered from depression, severe alcohol abuse and a personality disorder. They did believe Humphreys was at times likely psychotic. Further, Dr. Murphy would elevate Dr. Ferguson's diagnosis of severe alcohol abuse to an addiction. Although

-8-

Drs. Murphy and Vinekar, thus, disagreed with discrete points within Dr. Ferguson's diagnosis and thought she could have better presented this evidence, their testimony is essentially cumulative of Dr. Ferguson's resentencing testimony. As such, this "evidence would not have caused the jury to reach a different result." *Walker*, 228 F.3d at 1234; *see also, e.g., James v. Gibson*, 211 F.3d 543, 557 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 886 (2001).

Drs. Murphy's and Vinekar's testimony also included several new diagnoses, which Dr. Ferguson had not mentioned at the resentencing. Dr. Murphy testified that Humphreys had a methamphetamine addiction. And neurological tests indicated that Humphreys had organic brain damage, probably due primarily to chronic alcohol and methamphetamine abuse. Dr. Vinekar also testified that Humphreys showed symptoms of brain seizures, which could affect his behavior, including producing horrendous rage reactions and dissociative, dream-like states, as Humphreys had described on the day of the murder. These seizures could be treated with medication.

While these experts' opinions, therefore, did offer some new mitigating information, there is again no reasonable probability that, had defense counsel obtained and presented these later opinions, at least one juror would have voted against a death sentence. *See, e.g., Smith v. Massey*, 235 F.3d 1259, 1282 (10th Cir. 2000) (holding that, although petitioner's organic brain damage was proper

mitigating evidence that might help explain crime to some degree, its absence did not prejudice petitioner's defense because it would not have changed capital sentencing outcome), *petition for cert. filed*, (U.S. June 29, 2001) (No. 01-5117); *Smith v. Gibson*, 197 F.3d 454, 463 (10th Cir. 1999) (noting that, while such evidence would be mitigating, this court has, "on numerous occasions determined that . . . evidence of low I.Q. and/or organic brain damage does not outweigh evidence supporting . . . multiple aggravating circumstances") (quotations omitted), *cert. denied*, 531 U.S. 839 (2000). And even considered cumulatively with the testimony of Humphreys' aid to the jail guard, *see Gonzales v. McKune*, 247 F.3d 1066, 1078 n.4 (10th Cir. 2001), there is not a reasonable probability that this omitted mitigating evidence would have changed the sentencing result.

Lastly, Humphreys argues that defense counsel should have better prepared Dr. Ferguson to withstand the State's impeaching her testimony. The state appellate court, however, again determined Humphreys' defense had suffered no prejudice. *See Humphreys*, 947 P.2d at 577-78. This, too, was a reasonable application of *Strickland*.

During resentencing, the State attempted to impeach Dr. Ferguson's testimony with an unsigned 1987 psychiatric evaluation. That evaluation, however, actually corroborated much of Dr. Ferguson's testimony, including the fact that Humphreys experienced an agitated depression, characterized by

obsessive thinking and feelings of inadequacy; he was a chronic alcoholic; he suffered from a mixed personality disorder which contains both paranoid and antisocial features; and he has been profoundly affected by his actions. Cross-examination further elicited that Dr. Ferguson agreed with the 1987 evaluation's indication that stress from impending legal proceedings could exaggerate Humphreys' symptoms, and Humphreys is highly rebellious, nonconforming, does not profit from experience, and is impulsive and overly sensitive. Dr. Ferguson also agreed that Humphreys "'does not appear to have the internal controls necessary to keep his behavior within acceptable limits,'" when he was abusing alcohol. Resentencing tr. vol. V at 918-19 (quoting 1987 evaluation). Dr. Ferguson did interpret several scales on Humphreys' Minnesota Multiphasic Personality Inventory (MMPI) differently than the 1987 evaluation. The resentencing transcript, however, fails to establish that Dr. Ferguson was "destroyed" on cross-examination, as Humphreys' expert witness later opined at the post-conviction hearing, 1997 hr'g, vol. II at 372.

**II.    *Resentencing evidentiary issues.*** Oklahoma law provides that, upon remand for capital resentencing, "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding; additional relevant evidence may be admitted including testimony of witnesses who testified at the previous trial."

Okla. Stat. tit. 21, § 701.10a(4). Relying on this statute, the trial court refused to permit Humphreys to challenge, at resentencing, the admissibility of any evidence that the original trial court had admitted. On direct appeal from resentencing, however, the Oklahoma Court of Criminal Appeals held that,

> [b]ecause the parties are litigating anew the issue of punishment, the trial court must entertain objections to evidence from both parties. This necessarily includes objections that evidence was erroneously admitted in the original trial because [§ 701.10a(4)] specifically limits the admission of evidence from the original trial to that evidence which was "properly admitted."

*Humphreys*, 947 P.2d at 573 (quoting Okla. Stat. tit. 21, § 701.10a). Nonetheless, the state appellate court further held that the trial court's error in not permitting Humphreys to challenge previously admitted evidence did not warrant relief. *See id.* at 573-74. Humphreys now asserts the following three habeas claims, based upon the resentencing court's evidentiary rulings and its erroneous application of § 701.10a(4).

*A.* ***Resentencing jury's considering inadmissible evidence.*** A federal habeas court reviews state evidentiary rulings only to determine whether they resulted in a fundamentally unfair trial. *See, e.g., Elliott v. Williams*, 248 F.3d 1205, 1214 (10th Cir. 2001), *petition for cert. filed*, (U.S. July 30, 2001) (No. 01-5508); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Humphreys first argues that the resentencing court's blanket refusal to permit defense counsel to object to evidence previously admitted during the first trial

resulted, per se, in a fundamentally unfair resentencing proceeding. [2] Upon review of the entire record, however, we are convinced it did not.

Humphreys also challenges the resentencing court's permitting the State, during resentencing, to present unavailable witnesses' testimony by reading their complete testimony from the original trial. This included testimony to which defense counsel successfully objected at the original trial. This, however, occurred in only a very few instances and did not result in a fundamentally unfair resentencing proceeding.

**B.    *Privilege against self-incrimination.*** Although he did so during his first trial's guilt stage, Humphreys chose not to testify at resentencing. The resentencing court then permitted the State to read Humphreys' first-trial testimony to the resentencing jury. Humphreys claims this violated his Fifth Amendment privilege against self-incrimination, relying on *Harrison v. United States*, 392 U.S. 219 (1968). *Harrison* recognized, however,

> the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives,

---

[2]    Humphreys also asserts, without further discussion, that the resentencing court's erroneous refusal to hear new evidentiary objections deprived him of effective trial representation and an impartial jury. *See* Appellant's Opening Br. at 31, 34. These conclusory allegations, however, are insufficient to warrant habeas relief. *See Walker*, 228 F.3d at 1239-40 (declining to address "unsupported and undeveloped" habeas claims) (further quotation omitted).

-13-

and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

*Id.* at 222 (footnote omitted). Nonetheless, in *Harrison*, the defendant had testified at his first trial because the State had introduced his confessions, which the appellate court later determined to have been inadmissible. *See id.* at 220, 222. The Court, thus, held that "the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby--the fruit of the poisonous tree." *Id.* at 222.

*Harrison* does not directly address Humphreys' situation. *See Oregon v. Elstad*, 470 U.S. 298, 316-17 (1985) (noting *Harrison* applies where prosecution violated defendant's Fifth Amendment rights by introducing inadmissible confession). Humphreys, nonetheless, argues that, like *Harrison,* he was compelled to testify after the trial court refused to instruct on first degree manslaughter. *See* Appellant's Opening Br. at 37-38. Humphreys may have testified to support his manslaughter theory, but he could not have testified in response to the trial court's refusal to instruct on that lesser offense because the trial court did not refuse to give a manslaughter instruction until after Humphreys' testimony. *See United States v. Bohle*, 475 F.2d 872, 875-76 (2d Cir. 1973).

More to the point, the Oklahoma Court of Criminal Appeals, in Humphreys' original direct appeal, upheld the trial court's refusal to instruct on first degree manslaughter because there was no evidence supporting his theory that he killed the victim "'without a design to effect death.'" *Humphrey*, 864 P.2d at 345 (quoting Okla. Stat. tit. 21, § 711). The federal district court, in these habeas proceedings, also denied habeas relief on this claim, and Humphreys was not able to obtain a certificate of appealability on this issue. *See* 28 U.S.C. § 2253(c). There is, therefore, no support for Humphreys' suggestion that the trial court's refusal to give a manslaughter instruction *wrongfully* impelled Humphreys to testify at his first trial.

Humphreys further protests that the State, by having an assistant district attorney read Humphreys' prior testimony to the resentencing jury, improperly commented on his Fifth Amendment privilege not to testify at resentencing. *See Griffin v. California*, 380 U.S. 609, 615 (1965). That prior testimony, however, was admissible at resentencing. *See Harrison*, 392 U.S. at 222. And, in presenting Humphreys' first-trial testimony through transcript, the State did not unduly accentuate the fact that Humphreys had chosen not to testify at resentencing. The prosecutor's presentation was in no way "manifestly intended or . . . of such character that the jury would naturally and necessarily take it to be

-15-

a comment on the defendant's right to remain silent." *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) (further quotation omitted).

  **C. *Admission of Humphreys' custodial statements.* ** The resentencing court admitted three custodial statements Humphreys made, through testimony from probation and parole officer Donna Robertson, formerly Donna Loyd, Oklahoma State Penitentiary case manager Kenneth Harris, and county jail administrator Billy Plaster. Humphreys challenges the resentencing court's admitting this testimony without first conducting a *Jackson v. Denno* [3] hearing to determine whether Humphreys voluntarily made those statements.

  Initially, the State argues Humphreys procedurally defaulted these claims by failing to request 1) a *Jackson v. Denno* hearing at resentencing on Harris' testimony, and 2) a hearing during the original trial concerning Robertson's and Plaster's testimony. The Oklahoma Court of Criminal Appeals held that Humphreys had, thus, waived these claims. *See Humphreys*, 947 P.2d at 573, 574. Nevertheless, rather than consider Humphreys' possible procedural defaults, we will instead address the merits because we can "more easily and succinctly affirm[]" the denial of habeas relief by doing so. *See Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir.), *cert. denied*, 531 U.S. 982 (2000). Reviewing *de*

---

[3] 378 U.S. 368 (1964).

*novo, see Thomas v. Gibson*, 218 F.3d 1213, 1220 (10th Cir. 2000), we conclude

Humphreys is not entitled to habeas relief.

Robertson testified that, on the day after the murder, she helped transport

Humphreys from a state correctional facility to county jail. During that trip,

Humphreys admitted to Robertson that

> he had called [the victim] or gone to see her . . ., that he had told her
> that he loved her and that she laughed. He . . . got to thinking about
> it, and that is when he went to the bar. And he said that he thought
> he was hitting her, but he guessed he was stabbing her.

Resentencing tr. vol. III at 546. When they drove passed the Cuban Bar,

Humphreys also remarked "'[w]ell, I guess I'm famous now.'" *Id.* at 547. He

also acknowledged to Robertson his prior felony conviction.

Kenneth Harris testified that Humphreys had pled guilty to separate prison

disciplinary charges for menacing and possession of a homemade knife. Through

Harris, the State also admitted the prison disciplinary reports concerning these

incidents. Additionally, Billy Plaster testified that, during his investigation of a

jail altercation between Humphreys and another inmate, Humphreys had admitted

that he had planned to take revenge on that other inmate.

Humphreys does not specify why these custodial statements should be

deemed involuntary. *See* Appellant's Opening Br. at 41-42; *cf. Lucero v. Kerby*,

133 F.3d 1299, 1310-11 (10th Cir. 1998) (holding habeas petitioner, who argued

he was entitled to new *Jackson v. Denno* hearing, would not be entitled to habeas

relief unless he could show both deficiencies during first hearing and that "'his version of events, if true, would require the conclusion that his confession was involuntary,'" quoting *Procunier v. Atchley*, 400 U.S. 446, 451 (1971)). Humphreys' assertion that "the record is otherwise insufficient to determine 'whether the confession was voluntary or involuntary,'" Appellant's Opening Br. at 42, is insufficient. *Cf. Lucero*, 133 F.3d at 1312 (rejecting argument that "unanswered" questions as to circumstances of custodial statements required new hearing).

Moreover, any erroneous admission of an involuntary confession is subject to harmless-error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *see also, e.g., Castro v. Ward*, 138 F.3d 810, 823 (10th Cir. 1998). In this procedural posture, we must then determine whether admitting these custodial statements had a substantial and injurious effect or influence on the jury's verdict. *See, e.g., Walker*, 228 F.3d at 1225, 1235-36 (under Antiterrorism and Effective Death Penalty Act, applying *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), harmless error analysis, where state court itself did not address harmless error). In doing so, we "review[] the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless." *Fulminante*, 499 U.S. at 310. Even assuming the trial court did err in admitting Humphreys'

custodial statements, therefore, we conclude those errors were harmless.     *See Castro*, 138 F.3d at 823.

There was still overwhelming evidence, without Humphreys' statement to Robertson, that Humphreys killed Ms. Phipps and had previously suffered a violent felony conviction. And there was evidence, in addition to Plaster's testimony, indicating Humphreys had committed the prison misconduct charged in the disciplinary reports. Moreover, apart from this challenged testimony, there was substantial evidence supporting the jury's finding that Humphreys was a continuing threat to society. Humphreys, therefore, is not entitled to habeas relief based upon the trial court's admitting these custodial statements.     *See id.*

***III.    "Serving sentence of imprisonment" aggravating factor.***     The State charged, and the jury found, that Humphreys murdered Ms. Phipps while he was "serving a [felony] sentence of imprisonment," Okla. Stat. tit. 21, § 701.12(6), because he was on house arrest at the time. The Oklahoma Court of Criminal Appeals upheld applying this aggravating factor to Humphreys because, under house arrest, he remained in Department of Corrections' custody and was, thus, still serving his sentence.   *See Humphreys*, 947 P.2d at 575-76. Generally, "[a] federal court is bound by a state court's interpretation of the state's aggravator." *James*, 211 F.3d at 558 (in   *dicta*).

Humphreys argues, however, that Oklahoma's expansive interpretation makes this aggravating factor unconstitutionally vague and overbroad. This interpretation, however, is not unconstitutionally overbroad because the aggravator does narrow the class of murderers eligible for a death sentence. *See id.* at 558-59; *see also, e.g., Jones v. United States*, 527 U.S. 373, 401 (1999). Further, this aggravator's meaning is not vague. *See, e.g., United States v. Chanthadara*, 230 F.3d 1237, 1262 (10th Cir. 2000) (direct criminal appeal; noting vague aggravator fails to inform juries what they must find to impose death sentence), *petition for cert. filed,* (U.S. May 2, 2001) (No. 00-9757); *see also, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988). Because this "aggravating factor has a core meaning that criminal juries should be capable of understanding, it . . . pass[es] constitutional muster." *Jones*, 527 U.S. at 400.

Furthermore, the Oklahoma Court of Criminal Appeals' determination that there was sufficient evidence to support the jury's finding this aggravating factor was reasonable under either 28 U.S.C. § 2254(d)(1) or (2). [4] *See Romano v. Gibson*, 239 F.3d 1156, 1178 (10th Cir. 2001).

---

[4] Although this court has not yet resolved whether the state appellate court's sufficiency-of-the-evidence inquiry involves a legal or factual determination, we would reject Humphreys' claim here under either standard. *See Hale v. Gibson*, 227 F.3d 1298, 1335 & n.17 (10th Cir. 2000), *cert. denied,* 121 S. Ct. 2608 (2001).

-20-

## IV.  CONCLUSION

For these reasons, we AFFIRM the district court's denial of habeas relief from Humphreys' death sentence.