FILED
United States Court of Appeals
Tenth Circuit

September 15, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DONALD RAY WACKERLY, II,

      Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

Nos. 07-7034 and 07-7056

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CV-01-567-FHS-KEW)**

James T. Rowan, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma with him on the brief), for Respondent-Appellee.

Before **LUCERO, TYMKOVICH,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

      This case arises out of a 1996 crime in which Donald Wackerly planned

and executed the murder of a stranger for petty cash. After trial, an Oklahoma

jury found Mr. Wackerly guilty of first-degree murder and sentenced him to

death. An appeal and post-conviction habeas corpus petition before state courts

followed, but neither succeeded. Mr. Wackerly then filed a federal habeas petition in the United States District Court for the Eastern District of Oklahoma. The district court denied this petition, too. Mr. Wackerly now appeals the district court's disposition to us, and in doing so presents a single issue for our decision: whether trial counsel rendered ineffective assistance by failing to investigate and then present certain evidence to the jury during the penalty phase of his trial. Like the district court before us, we discern no reasonable probability that the evidence he points to would have altered his sentence. Accordingly, we affirm.

I

One evening in early September, 1996, Mr. Wackerly announced to his wife that they needed money and that he would do "whatever it took" to get it. He said this, almost as if to prove his point, while wearing latex gloves and loading his .22 caliber rifle, toweling off each bullet before packing it into the chamber.

The following day, with rifle in hand, Mr. Wackerly and his wife left their house in search of someone to rob. They drove to a dam on the Arkansas River near Muldrow, Oklahoma, in rural Sequoyah County. There, they spotted a lone truck parked by a levy, and an older gentleman, who turned out to be Pan Sayakhoummane, fishing nearby. Mr. Wackerly parked his Jeep a few feet from the truck and instructed his wife to walk down to the levy to see if any other people, aside from Mr. Sayakhoummane, were there. She did as she was told, talked to Mr. Sayakhoummane for a few minutes, and returned to her husband to

confirm that they were alone.  Mr. Wackerly then instructed his wife to sit and wait.

Forty-five minutes passed before Mr. Sayakhoummane returned to his truck, fishing gear in tow.  As he approached, Mr. Wackerly raised the hood of his Jeep and asked for help jump-starting the vehicle.  Knowing what was going to happen next, Mrs. Wackerly knelt behind the Jeep.  There, she heard seven or eight gun shots, followed by a thump.  When she stood up, she saw Mr. Sayakhoummane's body lying flat and her husband wrestling to free a fishing pole from underneath it.

In order to dispose of Mr. Sayakhoummane's body and truck, Mr. Wackerly drove the truck a short distance down a dirt road while Mrs. Wackerly followed in the couple's Jeep.  Mr. Wackerly stopped the truck at a fork in the road, removed the reels from Mr. Sayakhoummane's assorted fishing poles, and threw the poles into a wooded area.  He also took a tackle box from the truck before asking his wife to wait while he drove Mr. Sayakhoummane's truck, with Mr. Sayakhoummane's body lying in its bed, into the river.  As it happened, the truck's bumper caught on the river bed so the truck remained only partially submerged.  Finished with these tasks, as least as best he could, Mr. Wackerly returned to Mrs. Wackerly and the couple proceeded to a Sonic Drive-In restaurant for dinner.

Later that night, Mr. Wackerly sifted through the contents of Mr. Sayakhoummane's wallet and cut up all the identity cards he found. He placed the shredded cards in a ziplock bag and threw them away, as he did Mr. Sayakhoummane's wallet. The other property he had stolen — Mr. Sayakhoummane's tackle box and fishing reels — he stashed in a spare room. Eventually, Mr. Wackerly sold the reels to a local pawn shop for sixty dollars.

The day after the murder, a passerby found the partially submerged truck and Mr. Sayakhoummane's body. An initial investigation produced no leads but at last Mrs. Wackerly, by this point estranged from her husband, came forward and told Oklahoma state investigators what happened. Based on her account, an agent retrieved Mr. Sayakhoummane's fishing poles from the woods near the river and located his reels at the pawn shop, where the shop's owner confirmed that it was indeed Mr. Wackerly who had sold them. Agents also searched Mr. Wackerly's apartment and found Mr. Sayakhoummane's tackle box, a pair of latex gloves, a .22 rifle, and a box of ammunition with some bullets missing. Both the weapon and ammunition were consistent with the bullet removed from Mr. Sayakhoummane's body.

In due course, Mr. Wackerly was charged with first-degree murder and robbery. At trial, the State relied on the testimony of Mrs. Wackerly; physical evidence corroborating her account; the testimony of the pawn shop owner; and the testimony of Mrs. Wackerly's brother, Curtis Jones, who recounted that Mr.

Wackerly had confessed to him that he, Mr. Wackerly, had killed a man at the dam.  In the end, the jury convicted Mr. Wackerly of both the murder and robbery charges.

The case proceeded to a sentencing phase, at which the State argued that two statutory aggravating circumstances rendered Mr. Wackerly eligible for the death penalty:  first, that the murder was committed in a manner aimed to avoid or prevent a lawful arrest or prosecution; and, second, that there was a probability that Mr. Wackerly would commit future criminal acts of violence that would constitute a continuing threat to society.  Okla. Stat. tit. 21, § 701.12.  The State relied on the evidence presented during the guilt phase to support both arguments, and also introduced additional evidence to support the second.  This additional evidence established that Mr. Wackerly committed armed robbery of a Webber Falls, Oklahoma convenience store nine days after Mr. Sayakhoummane's murder.  While Mrs. Wackerly stood guard at the store's entrance, Mr. Wackerly, wearing a hunting mask and carrying a pistol, ordered the store's cashier to give him money.  When the cashier declined, Mr. Wackerly held his pistol within inches of the cashier's forehead and repeated his demand.  This time, the cashier complied.  As Mr. Wackerly walked with cash in hand toward the exit, he heard a banging from the back of the store.  Thinking it was a second employee, he turned back to the register, pointed his gun at the cashier, shouted "I'll kill both of you," and sprinted away.

For its part, the defense presented three witnesses during the penalty phase. Sue Spinas testified that Mr. Wackerly performed farm labor for her, that he was a reliable employee, and that she would hire him again if she had the opportunity. Donna Lomax, Mr. Wackerly's half-sister, testified that Mr. Wackerly was spoiled by his parents and never disciplined, and, as a result, and through no fault of his own, he generally seemed unprepared for life. Ms. Lomax also testified that, when he was fourteen, Mr. Wackerly was the driver in a car accident in which his passenger died. He was never made to take responsibility for causing someone's death, Ms. Lomax related, again contributing, in her estimation, to his general unpreparedness for adulthood. Finally, Diana Branham, Mr. Wackerly's step-sister, testified that her seven-year old son had a great relationship with Mr. Wackerly.

Based on this evidence, Instruction No. 10 to the jury informed them that:

> Evidence has been introduced as to the following mitigating circumstances:
>
> 1. The defendant did not have any significant history of prior criminal activity.
> 2. The defendant is likely to be rehabilitated.
> 3. The defendant's emotional/family history.
> 4. Don Wackerly loves his family[.]
> 5. Don Wackerly's family loves him.
> 6. Don Wackerly was a steady, reliable employee for Sue Spinas.
> 7. Don Wackerly's execution would have a devastating effect upon his nephew.

> In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well.

App. at 272. The jurors were further directed that they "may consider sympathy or sentiment for the defendant in deciding whether to impose the death penalty," and that they could impose a non-capital punishment even if they found the aggravating circumstances outweighed the mitigating circumstances. *Id.* at 273, 275.

The jury sentenced Mr. Wackerly to death for murder and life imprisonment for robbery. In doing so, the jurors unanimously found that both statutory aggravating circumstances supported the death penalty. The Oklahoma Court of Criminal Appeals (OCCA) affirmed Mr. Wackerly's conviction and death sentence on direct appeal, and then denied his motion for post-conviction relief. *Wackerly v. Oklahoma*, 12 P.3d 1, 19 (Okla. Crim. App. 2000), *cert. denied*, 532 U.S. 1028 (2001). Later, Mr. Wackerly filed a 28 U.S.C. § 2254 habeas petition in federal district court, challenging his conviction on a number of grounds. The district court denied all of his claims for relief and denied a certificate of appealability (COA). *See Wackerly v. Sirmons*, 2007 WL 963210 (E.D. Okla. 2007); 28 U.S.C. § 2253. This court, however, granted Mr. Wackerly a COA on two issues, although in briefing before us he has opted to pursue only one — specifically, whether trial counsel was ineffective for failing to investigate and present mitigating evidence at the penalty phase of his trial.

Until recently, an intra-circuit split of authority existed on what standard governs our review of habeas petitions presenting ineffective assistance of counsel claims, like Mr. Wackerly's, when the OCCA declines to supplement the original trial record with outside evidence proffered by the petitioner. Some of our cases have suggested that the deferential standard of review we typically apply under the Antiterrorism and Effective Death Penalty Act (AEDPA) pertains. *See, e.g.*, *Welch v. Sirmons*, 451 F.3d 675, 682, 704, 708-09 (10th Cir. 2006). Other of our cases have suggested that our review should be *de novo*. *See Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (en banc). Mr. Wackerly initially argued his appeal to us under AEDPA's deferential standard, but a majority of the active judges on our court *sua sponte* ordered this case consolidated with *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), and scheduled an *en banc* session to resolve our intra-circuit split of authority, *see Wilson v. Sirmons*, 549 F.3d 1267 (10th Cir. 2008). In the end, the *en banc* court concluded that we should review Mr. Wackerly's petition *de novo*. *Wilson v. Workman*, — F.3d —, 2009 WL 2623336 (10th Cir. 2009) (en banc).

Assessing his appeal *de novo*, Mr. Wackerly still has the burden of establishing two things to prevail. First, he must show that trial counsel "committed serious errors in light of 'prevailing professional norms' such that his legal representation fell below an objective standard of reasonableness." *Castro*

*v. Ward*, 138 F.3d 810, 829 (10th Cir. 1998) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  The inquiry here, even on *de novo* review, "must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 489.  Second, Mr. Wackerly must show that this deficient performance mattered — namely, that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Because counsel's alleged failures occurred during the sentencing phase of Mr. Wackerly's trial, this question focuses on whether there exists a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.  And because in Oklahoma only a unanimous jury may impose the death penalty, this question further narrows to focus on whether there is a reasonable probability "that at least one juror would have struck a different balance" but for counsel's putative misconduct. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Even assuming without deciding that counsel was ineffective for failing to develop and present potential mitigation evidence at the sentencing stage, Mr. Wackerly cannot demonstrate a reasonable probability that the evidence counsel

failed to amass and present would have affected the jury's ultimate assessment of the aggravating and mitigating evidence in this case. *See Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998) (court need not address both *Strickland* prongs if it determines petitioner fails on one). In reaching this conclusion under *Strickland*'s prejudice prong, we necessarily take account of "the strength of the government's case and the aggravating factors the jury found, as well as the totality of the mitigating factors that might have been presented." *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002); *see also Cooks*, 165 F.3d at 1293 (In evaluating prejudice, court "must look at the totality of the evidence, not just evidence that would have been helpful to [petitioner's] case."). Accordingly, in what follows we first explore the strength of the government's case as presented at trial before then turning to assess it against the mitigating evidence Mr. Wackerly says counsel should have produced.

A

There can be little question about the strength of the record supporting the jury's verdict in this case. On the question of guilt, Mrs. Wackerly testified to the time, place, and manner of Mr. Sayakhoummane's murder, and in every essential respect her account was corroborated by physical proof or the testimony of others. She directed law enforcement officers both to the victim's discarded fishing poles in the woods and to the victim's fishing reels at the pawn shop. A search of Mr. Wackerly's apartment revealed a .22 caliber weapon and a box of ammunition —

both consistent with the type of bullets that had been removed from the victim's body — as well as a box of latex gloves and the victim's tackle box. Mrs. Wackerly's brother, Curtis Jones, testified that Mr. Wackerly had confessed to him that he was responsible for the murder.

As to the two statutory aggravating factors, again strong evidence supported each. On the question whether the crime was committed in a manner aimed to avoid or prevent lawful arrest or prosecution, the State's evidence established that Mr. Wackerly went to a remote location to select a victim; instructed his wife to survey the area to make sure they were alone with the victim; and attempted to conceal his crime by driving the victim's truck, with the body in its bed, into the water. On the question whether Mr. Wackerly is likely to remain a threat, there was not only proof that the murder fazed Mr. Wackerly but little — he dined at the local Sonic shortly after the crime — there was also proof that just days after the murder Mr. Wackerly committed another robbery at gun-point. *Cf. Cooks*, 165 F.3d at 1289 (under Oklahoma law callous nature of crime is sufficient to establish continuing threat to society aggravator).

Neither can there be any serious question of Mr. Wackerly's moral culpability and awareness of the wrongness of his actions. He planned the crime the night before; drove to a secluded site in a calculated attempt to avoid detection of his crime; waited forty-five minutes for the victim to approach; tricked the victim by asking for help with his car; brutally killed his victim with

seven or eight gun shots; and then sought to hide the evidence of his crime. Given these circumstances, it is exceedingly implausible that a jury might conclude that Mr. Wackerly's mind was momentarily so clouded that he was unable to distinguish right from wrong. Underscoring this point, after the murder was completed Mr. Wackerly showed no recognizable remorse, dining out immediately after the event and just a few days later robbing a convenience store using a firearm and threats of violence. Simply put, this case is in no way analogous to those in which we have found the State's evidence on guilt and the aggravating circumstances comparatively weak. *See, e.g.*, *Mayes v. Gibson*, 210 F.3d 1284, 1291 (10th Cir. 2000) (granting petitioner evidentiary hearing on ineffective assistance of counsel claim given "relative weakness of the State's case, the jury's obvious struggle in deliberations, and the fact that only one aggravator was found").

B

While the government's case is strong, Mr. Wackerly's proffered mitigating evidence is not. Mr. Wackerly faults his trial counsel for failing to introduce four general categories of evidence. But we cannot see how any of this evidence would have made a difference. Indeed, our precedent compels just the opposite conclusion.

- 12 -

1

Mr. Wackerly first complains that his trial lawyer should have introduced evidence of his substance abuse problems. According to a report prepared by Dr. Mickey Ozolins, a neuropsychologist who saw Mr. Wackerly in preparation for his post-conviction habeas petition, throughout high school Mr. Wackerly drank alcohol excessively, used steroids to build muscle mass, and experimented, though minimally, with other substances. Then, starting around age twenty-four, he began to use approximately $25 worth of "crank" — slang for methamphetamine — per week. After two years, Mr. Wackerly was using up to $300 worth of the drug per day. About one and a half months before he was arrested, Mr. Wackerly stopped using methamphetamine and planned to enter a rehabilitation program, but in the end never did so and instead resumed his habit. Mr. Wackerly does not allege that he attempted to address his substance abuse problem at any other point in his life. In addition to Dr. Ozolins's report, Mr. Wackerly's high-school girlfriend submitted an affidavit saying that Mr. Wackerly's temper was normally short, but even shorter when he was abusing alcohol and drugs.

This court has repeatedly found that unproduced evidence of this sort often can have a distinctly double-edged nature to it: whatever mitigating effect such evidence might have had if presented, "it is just as likely the jury would react negatively" to it. *Davis v. Executive Dir. of Dep't of Corr.*, 100 F.3d 750, 763

(10th Cir. 1996). So, for example, in *Davis* we held that the petitioner was not prejudiced by his counsel's failure to investigate and present expert testimony at sentencing on the nature and effects of his severe alcoholism. Whatever the mitigating effect of such evidence, we held, it was equally possible that the jury would have faulted petitioner for his "repeated failures to effectively address" the problem. *Id.* In *McCracken v. Gibson*, 268 F.3d 970 (10th Cir. 2001), we similarly explained that evidence suggesting the petitioner became "irrational and violently destructive" when under the influence of alcohol or drugs surely bore an aggravating as well as mitigating quality because, while it might have "erase[d] or reduce[d] any lingering doubt the jury may have had concerning [the petitioner's] role in the offense," it might have also "bolster[ed] the jury's conclusion that [the petitioner] represented a continuing threat to society." *Id.* at 980. In *Sallahdin v. Mullin*, 380 F.3d 1242 (10th Cir. 2004), we similarly held that "the jury could have viewed [petitioner's] steroid use in a negative light. Not only are [the drugs] illegal, the jury could have drawn negative inferences from the fact that [petitioner] knowingly used the substances for a period of approximately four years." *Id.* at 1251. And in *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998), we noted that "[t]estimony concerning [petitioner's] substance abuse would have resulted in the introduction of details of [his] prior convictions and violent conduct, which invariably resulted from his substance abuse. The jury could have perceived such evidence as aggravating rather than mitigating." *Id.* at 782; *see*

*also DeLozier v. Sirmons*, 531 F.3d 1306, 1332 (10th Cir. 2008) (appellate counsel's decision not to argue on appeal that trial counsel was ineffective for failing to put on evidence of petitioner's substance abuse did not constitute deficient performance because such evidence could be considered a "two-edged sword").  Other circuits have come to much the same conclusion in analogous cases.  *See Pace v. McNeil*, 556 F.3d 1211, 1224 (11th Cir. 2009) (failure to present evidence of petitioner's substance abuse not deficient in part because "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence"); *Jones v. Page*, 76 F.3d 831, 846 (7th Cir. 1996) (failure to introduce evidence of petitioner's abuse problems was a reasonable strategic choice because such evidence was a "double-edged sword").[1]

Mr. Wackerly affords us no basis on which we might distinguish these cases from his own.  This isn't to say that the mitigating edge of unproduced substance abuse evidence can never be sharper than its aggravating edge.  But it is to say that Mr. Wackerly has not shown his is such a case.  By way of example,

---

[1] Some of these cases arise in the context of holding that defense counsel did not engage in deficient performance by failing to introduce evidence of the defendant's history of substance abuse.  Others arise, like our case, in the context of holding that counsel's failure to present such evidence didn't prejudice the defendant.  Whichever *Strickland* prong they arise under, these cases all demonstrate that substance abuse evidence often can have more aggravating than mitigating effect.

he does not argue that this is a case in which the aggravating aspect of his drug use was already placed before the jury, such that no further harm, and only good, could have come from introducing further details of his substance abuse habit. *See Smith v. Mullin*, 379 F.3d 919, 943 n.11 (10th Cir. 2004) (mitigating evidence of mental health problems not double-edged because aggravating "edge" of mental impairments was already presented to the jury in the guilt phase of trial). The jury in this case was *not* already made aware of the significant potential "aggravating" aspects of Mr. Wackerly's drug abuse that came to light in Dr. Ozolins's report, including the degree of Mr. Wackerly's drug abuse, its longevity, that he had previously engaged in "car theft activity to trade for drugs," and that he needed approximately $300 a day to feed his drug habit. And such evidence surely would have strengthened the State's case of guilt, supplying a persuasive motive for the murder, as well as its case that Mr. Wackerly posed a continuing threat to society, emphasizing that Mr. Wackerly's expensive and unaddressed habit gave him a continuing reason to rob and kill, even for modest sums.[2]

---

[2] The only evidence of Mr. Wackerly's drug use put before the jury came during his estranged wife's testimony when she testified that she and her husband had been on drugs around the time of the convenience store robbery. That *some* minuscule evidence of petitioner's drug use was before the jury does not diminish the aggravating nature of the substantial additional new evidence contained in Dr. Ozolins's report.

Likewise, and by way of further example, Mr. Wackerly does not allege that he was using drugs of a quality and in such quantities while planning and executing the murder that he was incapable of appreciating the difference between right and wrong. In *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008), the Ninth Circuit, albeit over a significant dissent, granted habeas relief to a petitioner whose counsel failed to present evidence that his client was heavily intoxicated with methamphetamine at the time of the crime. The petitioner proffered an expert who opined that the petitioner was "likely having impulse control problems, judgment impairment, and aggressiveness *at the time of the crime* and that he may have been experiencing drug-induced paranoia," such that a juror could reasonably be persuaded that the petitioner "was, *at the time of the crimes*, incapable of appreciating the wrongfulness of his conduct." *Id.* at 953-54 (emphasis added).[3] Even assuming without deciding the Ninth Circuit's holding

---

[3] *See also Hardwick v. Crosby*, 320 F.3d 1127, 1167 (11th Cir. 2003) (granting evidentiary hearing on effectiveness of counsel at sentencing in part because counsel failed to present evidence that client had committed murder after a "long Christmas weekend binge of drugs and alcohol"); *Jennings v. Woodford*, 290 F.3d 1006, 1017 (9th Cir. 2002) (finding counsel ineffective at guilt stage of capital trial for failing to investigate adequately the extent of client's heavy drug use, when there was evidence that client was on drugs at the time of the crime and an expert testified that reasonable investigation would have shown that during the period leading up to the murder petitioner suffered "psychotic symptoms including hallucinations, delusions, memory gaps and periods of dissociation"); *Brownlee v. Haley*, 306 F.3d 1043, 1071 (11th Cir. 2002) (granting habeas relief as to sentence where counsel failed to present mitigation evidence at sentencing and, among the evidence not presented, was petitioner's "extensive drug abuse, particularly on the night in question"); *cf. Pace*, 556 F.3d at 1224 (holding that

(continued...)

- 17 -

would pertain in our circuit, unlike Mr. Correll Mr. Wackerly simply does not allege that he was impaired by drugs at the time of the crime, let alone provide expert evidence that his mental state or capacity at the relevant times was so diminished that he could not appreciate right from wrong.[4]

2

Next, Mr. Wackerly submits that he suffers from certain psychological maladies that counsel should have disclosed to the jury. This evidence, however, bears the same problem as Mr. Wackerly's proffered substance abuse evidence: it is the type of "double-edged" evidence that could have as easily hurt as helped his cause.

Take Mr. Wackerly's claim that he suffers from self-destructive behavior and mood swings that cause him, in the words of his half-sister, to go "from happy to rage in a matter of seconds." In *Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. 2008), we confronted a similar circumstance, where the petitioner faulted

---

[3](...continued)
failure to investigate client's substance abuse problems not deficient in part because evidence indicated client was not on drugs at the time of the murder).

[4] All Mr. Wackerly alleges, by way of Dr. Ozolins's report, is that he was using "up to $300 a day" of methamphetamine and was "under the influence of recreational drugs almost constantly." App. Ex. M. at 3-4. It seems possible Mr. Wackerly goes no further because he cannot do so. The facts of his crime strongly suggest that he understood the wrongfulness of his conduct and accordingly sought to conceal his crime, *see supra* Parts I & II.A, and Mr. Wackerly's own expert, Dr. Ozolins, found that he retains above average nonverbal intelligence, average verbal intelligence, and superior planning and organization skills, *see infra* Part II B.3.

counsel for failing to introduce a neuropsychological report painting him as having difficulty conforming to societal norms "due to impulsivity, poor judgment, and the failure to see or understand the consequences of his actions," and as having a tendency to become "agitated and belligerent easily when frustrated." *Id.* at 1249. We held that such evidence has little mitigating value because it tends to "confirm[] the jury's conclusion that he represented a continuing threat, even if confined in prison for life." *Id.* at 1250. *See also Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (failure to introduce testimony of petitioner's psychiatric disorders "which distort his perceptions and impair his judgment" did not establish prejudice because it would portray him as an "unstable individual with very little impulse control" and strengthen argument that he was a continuing threat to society); *McCracken*, 268 F.3d at 980 (finding that petitioner was not prejudiced by counsel's failure to introduce evidence that he was capable of losing control of his anger and becoming "irrational and violently destructive," because it would have had a negative effect on the jury). Mr. Wackerly does not explain how or why a different result should obtain here.

Much the same might be said of Mr. Wackerly's assertion that he suffers from a dependent personality disorder that allows him to be easily influenced by others. Whatever mitigating value such evidence might have had, it also indubitably would have supported the State's claim that Mr. Wackerly constitutes a continuing threat to society. As we explained in *Young v. Sirmons*, 551 F.3d

942 (10th Cir. 2008), evidence that the petitioner committed a murder in reaction to others' influence or emotional distress risks portraying the petitioner as "a particularly dangerous person, capable of extreme violence in reaction to relatively common life events." *Id.* at 968.

3

Mr. Wackerly contends that counsel should have introduced a 1987 doctor's report in which a doctor noted that Mr. Wackerly "may be semi-retarded." Whatever other difficulties this argument has, as a factual matter it simply is not what it first appears to be. In 1987, Mr. Wackerly visited a doctor with complaints of venereal warts. That doctor made a note in Mr. Wackerly's patient file commenting that he might be "semi-retarded," but Mr. Wackerly does not suggest that the doctor was ever trained in mental health, and the note contains no explanation of the foundation for the doctor's opinion or any elaboration of it. There is, thus, no basis in the record for concluding the note constitutes a competent or considered medical opinion. Moreover, it is contradicted by more recent tests conducted by Mr. Wackerly's own expert, Dr. Ozolins. Dr. Ozolins concluded that Mr. Wackerly is far from semi-retarded, finding that he "is functioning in the Average range of verbal intelligence and the Above Average range of nonverbal intelligence," with an IQ score of 107 (average). App. Ex. M at 5-6. Dr. Ozolins also found Mr. Wackerly's spatial skills to be in the average-to-above-average range, his planning and organization skills "very superior," and

- 20 -

his memory and nonverbal reasoning skills superior. *Id.* at 6. On this record, we cannot see how counsel's failure to introduce a doctor's note from his youth and a very different context prejudiced him.

The same holds true with respect to the assortment of other medical records Mr. Wackerly proffers. Mr. Wackerly asserts that he "sustained organic brain damage during birth," Aplt. Br. at 29, but the records he points to show only that forceps were used during his birth, and that while he "was initially very bruised and cyanotic" and had a hematoma on his scalp, all this rapidly resolved, App. Ex. M at 1-2. Mr. Wackerly has presented no evidence indicating that any lasting organic brain damage followed. Neither has he proffered evidence showing that the accidents he suffered in later life, such as a 1988 motorcycle crash, resulted in any lasting brain damage. To the contrary, Dr. Ozolins's recent report strongly suggests that any injuries Mr. Wackerly suffered had little impact on his mental capacity.

We reject as well Mr. Wackerly's assertion that *Williams v. Taylor*, 529 U.S. 362 (2000), requires a different conclusion. There, the Supreme Court found trial counsel ineffective for failing to introduce testimony about the defendant's difficult childhood, his history of severe and repeated beatings from his father, the fact that his parents had been imprisoned for criminal neglect, and the fact that he was "borderline mentally retarded." *Id.* at 373 n. 4. Trial counsel was also found ineffective for failing to introduce evidence from prison guards

prepared to testify that Mr. Williams was a model inmate. *Id.* at 396. *See also Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (counsel ineffective where undiscovered mitigation evidence was "powerful" and included evidence that petitioner had experienced severe abuse in the first years of his life with his alcoholic, absentee mother; suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care; had been homeless for a period of time; and had diminished mental capacities). The evidence Mr. Wackerly presents is of a very different quality. Mr. Wackerly's neuropsychologist found that he was raised by his biological parents; that neither of his parents had any psychiatric, drug, or alcohol problems; that his mother was his "best friend"; that Mr. Wackerly indicated he had "no developmental problems except that he was a slow reader"; and that he "got along well socially in high school." App. Ex. M at 2-3. While Mr. Williams's "borderline retarded" mental condition might have made the jury doubt his moral culpability, the most recent and reliable tests show Mr. Wackerly's mental abilities to be very different. And, of course, we have before us none of the plainly mitigating evidence of good prison behavior present in *Williams*.

4

Other items of evidence Mr. Wackerly argues his counsel should have introduced are merely cumulative of the evidence the jury did hear. For example, Mr. Wackerly complains that his attorney should have presented proof that Mr.

- 22 -

Wackerly never recovered emotionally after he was in a car accident at fourteen, and was "coddled" by his parents. These same concepts, however, were communicated to the jury through the testimony of Mr. Wackerly's half-sister, Donna Lomax. We cannot say, as we must for Mr. Wackerly to prevail, that further presentation of the same evidence from different witnesses was reasonably likely to have made a difference in his sentence. *See Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th Cir. 2001) (holding that failure to present evidence that is cumulative of evidence actually heard by the jury does not establish prejudice); *James v. Gibson*, 211 F.3d 543, 557 (10th Cir. 2000) (same); *Foster v. Ward*, 182 F.3d 1177, 1189 (10th Cir. 1999) (same); *Moore v. Reynolds*, 153 F.3d 1086, 1099 (10th Cir. 1998) (same).

Mr. Wackerly finally faults trial counsel for failing to introduce evidence that he was exposed to toxic chemicals in one of his jobs, that he was a poor student, that he was an unreliable employee, and that he may have Attention Deficit Disorder as well as narcissistic and depressive traits. This proffered proof no doubt illustrates that Mr. Wackerly has experienced his fair share of difficulties in life, but we cannot say there is a reasonable probability that it would have moved any juror to change his or her sentencing calculus. The evidence does not give context to the murder, provide an explanation for Mr. Wackerly's behavior, or suggest Mr. Wackerly bears any less moral culpability for his actions. In short, it does little to counteract the strength of the State's case

- 23 -

or render questionable the two aggravating factors found by the jury, and we cannot say that the jury might have imposed a different sentence had they been presented with these scattered pieces of Mr. Wackerly's life.[5]

* * *

This simply is not a case where unproduced mitigation evidence is of such a kind and quantity as to call into question the outcome of Mr. Wackerly's penalty phase proceedings. The case against Mr. Wackerly was strong and the non-cumulative evidence Mr. Wackerly faults trial counsel for failing to present bears a distinctly double-edged quality to it, likely to have favored the State's case at least as much as his. Given this, we are obliged to affirm.[6]

---

[5] We deny Mr. Wackerly's request for an evidentiary hearing. Even assuming we may review his request under pre-AEDPA standards in light of Mr. Wackerly's effort to develop his claim in state court, *see Barkell v. Crouse*, 468 F.3d 684, 693 (10th Cir. 2006), taking all his factual allegations as true they still fail, for reasons we have given, to entitle him to relief, *cf. Matthews v. Workman*, — F.3d —, 2009 WL 2488142, at *15 n.8 (10th Cir. 2009).

[6] Shortly after receiving a COA on his habeas petition, Mr. Wackerly filed a pleading with this court seeking permission to file a second or successive habeas application with the district court. In this pleading, Mr. Wackerly sought permission to present a new claim that his trial counsel was constitutionally ineffective for failing to investigate Mr. Wackerly's claim that Mrs. Wackerly committed the murder. After receiving the State's response, Mr. Wackerly sought to withdraw his request for authorization to file his second and successive habeas petition. He asked that the motion be dismissed without prejudice to refile at a later date. Though his motion for dismissal did not indicate his reasons for seeking dismissal, Mr. Wackerly has since conceded that he "does not have a compelling basis for successor permission at this time." Br. in Support of Motion, at 7. Briefing ensued on the question whether a motion for authorization to file a second or successive petition under 28 U.S.C. § 2244(b)(3)(A) constitutes

(continued...)

[6](...continued)
the presentation of an "application" under 28 U.S.C. § 2244(b), thereby triggering the restrictions on filing additional habeas petitions outlined in that statute. On reflection, we believe the answer to that question should be left to another day because, at this point at least, it remains unclear whether Mr. Wackerly will choose to attempt to file another habeas petition. If and when he does, we can address the issue. Therefore, we grant Mr. Wackerly's motion to dismiss his earlier motion seeking permission to file a second or successive habeas petition, but we decline to pass on whether this dismissal bars him from filing future habeas petitions.