**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NATHAN DUNLAP,

      Petitioner - Appellant,

v.

TOM CLEMENTS, Executive
Director, Colorado Department of
Corrections; JOHN W. SUTHERS,
Colorado Attorney General,

      Respondents - Appellees.

No. 10-1424
(D.C. No. 1:08-CV-00256-JLK)
(D. Colo.)

## ORDER AND JUDGMENT[*]

Before **KELLY**, **MURPHY**, and **HARTZ**, Circuit Judges.

      Petitioner-Appellant Nathan Dunlap appeals from the denial of his habeas

corpus petition.  28 U.S.C. § 2254.  Our jurisdiction arises under 28 U.S.C. §§

1291 & 2253(a).  We affirm.

## Background

      In February 1996, Mr. Dunlap was convicted of four counts of capital

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

murder and various other crimes in connection with the murder of three teenagers and a 50-year-old mother of two at a Chuck E. Cheese's restaurant in Aurora, Colorado. In May 1996, in accordance with jury verdicts, he was sentenced to death on the four murder counts and consecutive terms totaling 113 years on the other counts.

In July 1993, Mr. Dunlap had been fired from his position as a cook at the restaurant and wanted to "get even." On the night of December 14, 1993, he hid in the bathroom until closing, then emerged and shot employees Sylvia Crowell, Colleen O'Connor, Bobby Stephens, Marge Kohlberg, and Ben Grant. Mr. Stephens was hit in the face at close range but survived. Mr. Dunlap's sentence was upheld by the Colorado Supreme Court on direct review. Dunlap v. Colorado, 975 P.2d 723 (Colo. 1999). That court also affirmed the denial of a motion for sentence reconsideration, People v. Dunlap, 36 P.3d 778 (Colo. 2001), as well as the denial of a motion for post-conviction relief, Dunlap v. Colorado, 173 P.3d 1054 (Colo. 2007). The federal district court denied habeas relief. Dunlap v. Zavaras, 2010 WL 3341533 (D. Colo. Aug. 24, 2010).

The district court granted a certificate of appealability ("COA") on whether the jury improperly considered a non-statutory aggravator. 28 U.S.C. § 2253(c)(2). This court expanded the COA to include whether counsel was ineffective in (1) terminating a mental-illness investigation, (2) laboring under a conflict of interest, and (3) failing to exhaust all peremptory challenges.

2

## Discussion

We review the district court's legal analysis de novo, <u>Welch v. Workman</u>, 639 F.3d 980, 991 (10th Cir. 2011), applying the same deferential standard of review: a petitioner is entitled to federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or...was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). We presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). On appeal, we consider Mr. Dunlap's four issues, reciting the facts as necessary.[1]

A.    <u>Were counsel ineffective in terminating a mental-illness investigation?</u>

Mr. Dunlap argues that trial counsel were ineffective when they terminated their investigation into his possible mental illness—evidence of which, he argues, could have mitigated his culpability enough to persuade at least one juror to vote for life imprisonment instead of death. Aplt. Br. 22-84. Mr. Dunlap argues that

---

[1] As we explain below, our review of the record persuades us that the highest state court's resolution of Mr. Dunlap's claims was not "diametrically different" or "mutually opposed" to Supreme Court precedent. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405–06 (2000); 28 U.S.C. § 2254(d)(1). Nor did the Colorado court apply the Supreme Court's rules to materially indistinguishable facts and reach a different result. <u>Id.</u> at 406. Nor did any unreasonable determination of the facts pertinent to each claim occur. 28 U.S.C. § 2254(d)(2).

3

his lead trial counsel, Forrest W. Lewis, knew Mr. Dunlap's mother had a history of mental illness; that he, Mr. Dunlap, manifested similar symptoms after his arrest; that hospital records showed bizarre behavior like 48-hour periods without sleep; that after the trial two doctors offered opinions that Mr. Dunlap suffered bipolar disorder with psychotic features; that Mr. Lewis hired a doctor to build a mitigation case but refused to give her Mr. Dunlap's full records; that Mr. Lewis stopped investigating Mr. Dunlap's mental health for purposes of mitigation and instead focused on Mr. Dunlap's family dysfunction. The state argues that the defense not only conducted a superior investigation but found it strategically imperative to forgo proffering mental-health mitigation evidence: it would have opened the door to evidence that Mr. Dunlap was malingering; that he had been an abusive, offensive patient; and that he repeatedly bragged of his crime.

In Harrington v. Richter, 131 S.Ct. 770 (2011), the Supreme Court reiterated the high hurdle a defendant faces in establishing ineffective assistance after a state court decides to the contrary. First, because habeas review under 28 U.S.C. § 2254(d) "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority," federal courts can only issue the writ where there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. at 786-87. Second, the Strickland test is itself "highly deferential," since post-trial inquiry can "threaten the integrity of the very adversary process the right to counsel is meant

4

to serve." Id. at 788. That rule, of course, requires proof of deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Together the standards are "doubly" deferential. The question becomes whether there is "any reasonable argument" that counsel satisfied Strickland. Harrington, 131 S.Ct. at 788.

The Colorado Supreme Court's conclusion that Mr. Lewis satisfied the standards required of counsel by Strickland is not an unreasonable application of federal law and is supported by the evidence. The judge who conducted Mr. Dunlap's trial also handled the post-conviction proceedings over an extraordinary 52 days of hearings. He produced a 368-page order concluding that Mr. Lewis was deficient in his mental-health investigation but that this did not prejudice Mr. Dunlap.

The Colorado Supreme Court reversed the deficiency finding, Dunlap v. People ("Dunlap III"), 173 P.3d at, 1063, and related the following course of events: Mr. Dunlap began acting strangely in February 1994. After Mr. Dunlap was moved to a mental hospital, Lewis had psychiatrist Dr. Robert Fairbairn appointed to observe Mr. Dunlap independently and help craft a mental-health mitigation case. Id. at 1064. Yet Dr. Fairbairn concluded that Mr. Dunlap was normal 50% of the time, malingering for 40%, and suffering some sort of psychosis for 10-20% of the time. That summer, Dr. David Johnson, a physician who worked at the state hospital, submitted his own set of reports. Mr. Lewis

5

found it the "most consistently damaging and consistently negative and consistently devastating set of reports that I have ever seen." Id. Dr. Johnson not only saw no major mental illness, but his reports detailed Mr. Dunlap's abusive behavior toward staff and patients while hospitalized. A second hospital doctor, psychologist Frank Lee, identified only volitional conduct and no psychosis. Id. at 1064 n.9.

In February 1995, Mr. Lewis hired psychiatrist Dr. Rebecca Barkhorn as a "mitigation expert." Id. Her role was to get to know Mr. Dunlap and his family with a view to expert testimony on how Mr. Dunlap's home life encouraged his criminality, and to again evaluate his mental health. She met with Mr. Dunlap until December 1995 and diagnosed narcissistic personality disorder with antisocial traits. During her evaluation, Dr. Barkhorn received the reports from Dr. Johnson and Dr. Lee, but never the full hospital records. Mr. Lewis testified that he withheld the full record because he wanted a fresh, untainted assessment, and because he feared that, if she were called as a witness, the prosecution would obtain the ruinous hospital records, Box 23, Vol. LX, 152-54. At a post-conviction hearing, Mr. Dunlap called four doctors. The court only found two credible; of those, they diagnosed bipolar disorder at the time of trial but expressed no opinion on his mental health at the time of the murders. Dunlap III, 173 P.3d at 1065. The trial court concluded that the defense could not have presented a credible expert at trial to convincingly diagnose Mr. Dunlap as

6

bipolar.  See Aplee. Br. at 59, 80.

The Colorado Supreme Court held: "Evaluating the situation from trial counsel's viewpoint at the time, and according great deference to counsel's decision, we find the limited mental health mitigation investigation was supported by reasonable professional judgment."  Dunlap III, 173 P.3d at 1068.  This holding is entitled to deference.  Counsel began preparing for mitigation immediately upon appointment; they hired a private investigator for the duration of trial, who (with staff) traveled to eight states to interview family members and others and hunt for mitigating evidence; they reviewed Mr. Dunlap's school, hospital, and juvenile history records; they sought Mr. Dunlap's mother's medical records but she refused to release them; they persisted in getting independent experts appointed.  Above all, counsel made a reasonable decision to refrain from a mental-health proffer in the belief that whatever benefits might accrue were decisively outweighed by the crushing harm it would inflict.  They felt it "paramount" to keep the door closed on Mr. Dunlap's hospital behavior:

> [he] was physically and verbally abusive toward staff, stalked another patient, demeaned mentally ill patients, flashed gang symbols at peers, was incontinent, acted like a chicken, threw food, chewed holes in his mattress, and made repeated statements about the Chuck E. Cheese crimes, including disparaging remarks about the victims.

Dunlap III, 173 P.3d at 1066.  Mr. Dunlap told a nurse that the victims meant nothing to him and that he would kill again.  Id. at n. 14.  He told Dr. Lee that he

7

considered himself a "legend," id., and declared: "I'm gonna play crazy as long as I can.... The police have no case against me, they're stupid." Box 25, Book 3, DEPCX-3_1_2, at 4. Mr. Lewis believed Mr. Dunlap's statements about the crime and lack of remorse "would just be something that even our best juror wouldn't be able to get over." Dunlap III, 173 P.3d at 1066-67. As for the hospital report, Mr. Lewis said, "I tried to look at it as a juror and I saw it not only as a non-Axis-I diagnosis, but I saw it as fairly pervasively stating the case for malingering." Id. at 1066 n. 13. For this reason, counsel, a year before trial, decided to rest its mitigation case on Mr. Dunlap's troubled childhood. The Colorado Supreme Court faulted Mr. Lewis for not handing over the complete record to Dr. Barkhorn, but concluded the decision was reasonable, since by the time she was hired, Mr. Lewis had been thoroughly discouraged from pursuing this line of mitigation. Dunlap III, 173 P.3d at 1068. And Dr. Barkhorn only testified that with the full record she would have diagnosed bipolar disorder with psychotic features—still insufficient, in Mr. Lewis's view, to save Mr. Dunlap's life. See, e.g., Box 23, Vol. LX, at 65-69; Vol. LXII, at 134-43, 150-64; Vol. LXV, at 115-20. Evidence of mental illness can arouse sympathy and diminish culpability—or it can raise the specter of an irrational, incorrigible predator. See Cullen v. Pinholster, 131 S.Ct. 1388, 1410 (2011). The defense team agreed unanimously that the bipolar argument would have exposed Mr. Dunlap to evidence so damning as to give the jury *additional* grounds for death. Aple. Br.

8

at 52; see, e.g., Box 23, Vol. LX, at 71-72, 173-74, 206-10; Vol. LXI, at 125-26, 188-90; Vol. LXII, at 137-39; LXV, at 114.

On occasion, the Supreme Court has condemned an attorney's failure to thoroughly investigate sentencing-phase mitigation evidence as constitutionally deficient assistance. But the operative facts in those cases bear no comparison here. Those cases involve inexcusable neglect, not a long-considered strategic decision. In Williams v. Taylor, 529 U.S. 392, 395-96 (2000), the lawyer's investigation began a week before trial and, if properly done, would have uncovered a "nightmarish childhood" and borderline retardation; the failure was partly due to an erroneous belief that state law barred his access to records. In Wiggins v. Smith, 539 U.S. 510, 524-25, 534-35 (2003), the attorneys, through "inattention," abandoned an investigation that would have revealed abuse, alcoholism, molestation, and diminished mental capacity; they looked only at presentence and social-service reports. In Rompilla v. Beard, 545 U.S. 374, 383-84 (2005), counsel failed to review the file of his client's prior rape conviction, even after the prosecution warned of its plan to use it to establish aggravation. In Porter v. McCollum, 130 S.Ct. 447, 453 (2009), counsel only met briefly with his client before the penalty phase and neglected to obtain his school, medical, and military records or to interview his family members. And in Sears v. Upton, 130 S.Ct. 3259, 3264 (2010), the investigation, which didn't exceed a day, was limited to talking to witnesses selected by the defendant's mother.

9

As explained by the Colorado Supreme Court, Mr. Dunlap's counsel did not fail to conduct a mitigation investigation or ignore a promising lead or scramble to prepare against evidence of aggravation; rather, Mr. Lewis and co-counsel pursued one course, found it perilous, and switched to another: "[T]here were so many doors in this case that could be opened that we knew would undoubtedly be devastating to our client.... Every day, every minute, every witness, every hour you're making those kind of balancings and those kind of decisions.... And it's still overwhelming...it was the most difficult strategic case I could ever imagine[,] that I've ever had or ever will have." Dunlap, 173 P.3d at 1068 n.16. "There comes a point," instructs the Supreme Court, "where a defense attorney will reasonably decide that another strategy is in order." Cullen, 131 S.Ct. at 1407.

Mr. Dunlap's current counsel says of the mental-health evidence, simply: "It was not damaging." Aplt. Reply Br. 12. Rather, it was the missing explanation for Mr. Dunlap's "otherwise inexplicable behavior." Id. The record does not support the assertion that the evidence was unproblematic; at best, the evidence cuts both ways. The Colorado Supreme Court's conclusion that Mr. Lewis exercised reasonable professional judgment must be upheld. Dunlap, 173 P.3d at 1067. Lawyers often disagree on trial strategy, a fact disregarded in the vast number of ineffectiveness claims. We treat each case on its own merits but we also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

10

In this respect we note that Mr. Lewis has tried more than 50 first-degree murder cases over 20 years of practice and spared clients the death penalty in each of his ten capital cases. He commendably devoted years of skill and dedication to an uncommonly desperate cause—like petitioner's counsel today.

B.    Did counsel have a conflict of interest and was Mr. Dunlap's waiver valid?

Mr. Dunlap next argues that Mr. Lewis labored under an actual conflict of interest. Aplt. Br. 84-116. In November 1995, Mr. Lewis received from Mr. Dunlap a letter sent him by an ex-cellmate named Miguel Kirkpatrick—who also happened to be a former client of Mr. Lewis's—accusing Mr. Dunlap of labeling him a snitch. Mr. Lewis mailed it to Mr. Kirkpatrick's lawyer, who forwarded it to prosecutors. Mr. Dunlap claims Mr. Lewis did so to help Mr. Kirkpatrick get a better plea deal. Mr. Lewis, when the issue arose months later, didn't disclose the letter to appointed conflict counsel or tell him of the judge's supposed willingness to exclude Mr. Kirkpatrick as a witness if Mr. Dunlap did not waive his right to unconflicted counsel. Mr. Dunlap concludes that he received ineffective assistance and that his waiver was not voluntary, knowing, and intelligent. The state disputes the existence of a conflict on grounds that Mr. Lewis had no duty to Mr. Kirkpatrick; that Mr. Dunlap in any event waived his rights; and that Mr. Lewis had no right to destroy evidence on Mr. Dunlap's behalf.

A line of cases—Holloway v. Arkansas, 435 U.S. 475 (1978), Cuyler v. Sullivan, 446 U.S. 335 (1980), Wood v. Georgia, 450 U.S. 261 (1981), Mickens

11

v. Taylor, 535 U.S. 162 (2002)—stands for the propositions that an actual conflict of interest denies a defendant effective assistance; that the burden is on the party alleging the conflict; and that, if a conflict in fact impaired the representation, prejudice is presumed. In Holloway, the trial judge essentially forced a joint representation over the attorney's objection. In this case, by contrast, the trial judge conducted a conflict hearing, appointed independent conflict counsel, and sought waivers from Mr. Lewis's former and current clients. In Sullivan, Wood, and Mickens, the trial courts did not inquire about the conflicts. The relevant rule here, from Sullivan, is that the "possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 350.

The Colorado Supreme Court, like the court in both the trial and collateral proceedings, saw nothing amiss: Mr. Lewis represented Mr. Kirkpatrick in an unrelated criminal matter, a year before trial, and promptly withdrew when he learned that his two clients had attempted an escape together. Dunlap III, 173 P.3d at 1069-70. Only *after* Mr. Lewis withdrew from his representation of Mr. Kirkpatrick did Mr. Dunlap confess to Mr. Kirkpatrick; Mr. Kirkpatrick then brought these statements to the DA. Id. at 1070. About six months later, in August 1995, the prosecution (to protect its record) raised its concern about a conflict. Id. The court said it would *consider* barring Mr. Kirkpatrick if that was

12

the only way to resolve the conflict short of finding new lawyers—the matter was now two years old and trial was imminent. Id. at 1071. Most importantly, at a December conflict hearing, Mr. Dunlap said he wished to retain Mr. Lewis. Id. Special counsel Jeffrey Pagliuca, appointed to advise Mr. Dunlap, found no conflict and tendered Mr. Dunlap's waiver. Id. at 1071-72. Mr. Dunlap waived again in open court. Id. at 1072.

The Colorado Supreme Court held that under its precedent a conflict can arise when a defense attorney has previously represented a prosecution witness; the main problem in such cases is that the duty of confidentiality to the former client can hinder cross-examination. Id. at 1070. But it can be waived, subject to a test that balances defendant's choice of counsel and the public interest in the integrity of proceedings. The court found that Mr. Dunlap's preference, along with Mr. Kirkpatrick's waiver, eliminated the conflict. Id. at 1073. As for the claim that Mr. Lewis was deficient in failing to inform Mr. Pagliuca of the court's comment about excluding Mr. Kirkpatrick, the court found that Pagliuca himself likely informed Mr. Dunlap of the possibility of exclusion should he choose not to waive. Id. at fn. 22. It also found that the trial court's chief concern was delay, not any conflict in potentia. Id. at 1073. The court dismissed, as "speculation," the claim that Mr. Lewis passed on the letter to aid Mr. Kirkpatrick. Id. at 1074. And it noted that "producing evidence" against one's client is not per se a violation; that the letter, as evidence, was not as "strong" as Mr. Dunlap claims

13

(the letter showed that Mr. Kirkpatrick was upset with Dunlap, nothing more); and that Mr. Lewis turned over the letter to Kirkpatrick's attorney, not the government (though its receipt was foreseeable). Id. The court felt Lewis's hand-over was an "isolated incident." Id.

The district court found the Colorado Supreme Court's holdings—that Dunlap waived his right to conflict-free counsel and that Mr. Lewis's supposed residual loyalty to Mr. Kirkpatrick was a question of fact that Mr. Dunlap had the burden to prove—were "eminently reasonable." Dunlap, 2010 WL 3341533, at *17. We agree and see no conflict with federal law. The trial court took great pains to ensure that Mr. Dunlap understood his rights, see Dunlap, 173 P.3d at 1072, and, just as important, it worked to guarantee that Mr. Dunlap was able to keep the lawyer he wanted. As for the delivery of the letter supposedly proving a conflict, it seems doubtful that Mr. Lewis, after his promptitude in withdrawing from Mr. Kirkpatrick's matter after the escape attempt, and his assiduity in defending Mr. Dunlap over two-and-a-half years, would consciously supply evidence that he would later need to fend off at trial.

C. <u>Was counsel ineffective in failing to exhaust all peremptory challenges?</u>

Under Colorado law, a lawyer selecting a jury must exhaust his peremptory challenges if he wishes to preserve the right to appeal the denial of a challenge for cause. Mr. Lewis did not so exhaust. Mr. Dunlap argues that if he had, and if those denials were found erroneous on appeal, he "could have automatically

14

vacated [the] death sentence." Aplt. Br. 130. The state claims Mr. Lewis decided that exhausting his peremptories (on pretextual grounds, of course) risked seating unacceptable jurors, and that this decision was a reasonable exercise of judgment.

Mr. Dunlap acknowledges Mr. Lewis's anxiety that by excusing juror A, the now-seated juror B could be worse—and he might then be left without challenges. But Mr. Dunlap argues that because Mr. Lewis's challenge for cause to juror A *could possibly* have been erroneously denied—the appellate court finding that the juror was determined to impose the death penalty—this error, under a standard of "reasonable probability," could have mandated reversal. The Colorado Supreme Court rejected his claim under Colorado precedent; the district court found no clearly established federal law to the contrary, beyond possibly a broad application of Strickland itself, Dunlap, 2010 WL 3341533, at *18. We see no conflict between federal law and the determination of the Colorado Supreme Court: it found that Mr. Lewis made a reasonable strategic choice, Dunlap III, 173 P.3d at 1084-85, and credited his testimony that "we had achieved a jury panel that I felt we could accept and there were a number of jurors coming up in the order of jurors who I felt were unacceptable to us...." Id.

The dispute is this: Mr. Dunlap claims Mr. Lewis should have preserved a claim for appeal (notwithstanding the unlikelihood of success); Mr. Lewis felt duty-bound to accept the best jury he could get. His decision was a product of instinct, experience, venire research, strategy, and courtroom observation. He

15

saw this as a "penalty phase case," an effort in the face of overwhelming evidence of guilt to save Mr. Dunlap's life. Aple. Br. 114; see Box 23, Vol. LXI, 154-59. He had asked each venire member to complete a 13-page questionnaire; he received permission to investigate them before jury selection (which included driving past their homes, observing whether children seemed to live there, taking note of their bumper stickers, and researching their backgrounds in computer databases); finally, he devised profiles of desirable jurors, sought Mr. Dunlap's impressions of those he saw, and scored them on a 1-10 scale. Aple. Br. at 114-15; Box 23, Vol. LXI, 159-60, 67-68. During selection Mr. Lewis could see who was up after a strike and at all times wanted to have more challenges left than the state. "Our best hope," he testified, "was one person on that jury who would not vote death"—preferable, he thought, to "relying on legal issues in an appellate court," which he characterized as a gamble that he "refuse[d]" to make with Mr. Dunlap's life. Box 23, Vol. LXI at 181, 165-66.

Mr. Dunlap discusses the biases of two potential jurors—both finally struck by Mr. Dunlap's peremptories—but the Colorado Supreme Court did not review their fitness to serve. The implicit consideration is that if jurors were objected to but nonetheless removed by peremptory strike, the defense cannot complain, so long as it accepted the jury with peremptories still in its quiver. Steven Gayle, Mr. Lewis's co-counsel, thought Mr. Lewis should have exhausted but could not identify any jurors that would have supported a reversal. Box 23, Vol. LXI, 173-

16

78. The Colorado Supreme Court's conclusion that Mr. Lewis was not ineffective for not exhausting peremptory challenges does not conflict with federal law.

D.    Did the jury improperly consider a non-statutory aggravating factor?

Mr. Dunlap's last argument is that he was denied his Eighth Amendment right against cruel and unusual punishment when the jury erroneously heard extensive evidence, at the death-eligibility stage, that suggested that he posed a continuing threat. Aplt. Br. 147-73. Under Colorado law, the quality of not being a continuing threat is a mitigating factor that only the accused can raise. Mr. Dunlap argues that the 30 or so witnesses called to "rebut" the notion that he was not a continuing threat in effect created a new, non-statutory aggravating factor.

The Colorado Supreme Court held that it was error to allow the jury to consider this "rebuttal" evidence at the death-eligibility stage, People v. Dunlap ("Dunlap I"), 975 P.2d 723, 740 (Colo. 1999). In doing so it overruled a decision that the trial court relied on, People v. Saathoff, 790 P.2d 804 (Colo. 1990). In Colorado, a capital jury generally proceeds through four steps: find any aggravating factors, find any mitigating factors, weigh them against each other, and then choose between life imprisonment or death. Dunlap I, 975 P.2d at 736. The first three concern "eligibility" for death. "Aggravating circumstance evidence" (unlike prosecution evidence that relates to a statutory aggravator) is admissible only in step four, the life-or-death stage. Id. at 740. The "rebuttal"

17

evidence in this case included six prior aggravated robberies (three unadjudicated), victim responses to the robberies, Mr. Dunlap's excitement and bragging about them, gang activity, a drive-by shooting, threats against witnesses, crack cocaine sales, a tattoo with a smoking gun and the words "By Any Means Necessary," and his escape attempt. Yet the Colorado Supreme Court found the error harmless, because limiting instructions "precluded the jury from weighing the evidence in question as aggravating evidence during steps one through three." Id. at 742. These instructions told the jury that it could not consider evidence concerning mitigating factors as aggravation and that it could only weigh the aggravating factors against the mitigating factors. Id. at 743.

Mr. Dunlap cites Brown v. Sanders, 546 U.S. 212, 217 (2006), for its statement that, in a "weighing" state, as Colorado is in its first three steps, jury consideration of an "invalid eligibility factor necessarily skew[s] its balancing of aggravators with mitigators." Yet this quotation omits an important qualification that follows: "unless a state appellate court determined the error was harmless." Id. Here, the state court did so determine.

Assuming *arguendo* that this error violated the U.S. Constitution, a federal habeas court reviews for harmlessness under the standard of Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), which asks whether the error had a "substantial and injurious effect" on the jury's verdict. For the reasons identified by the Colorado Supreme Court, we must agree that the error was harmless.

18

Moreover, the jury expressly found (beyond a reasonable doubt) seven *other* aggravating factors for each victim: previous felony conviction for second-degree kidnapping involving the use of a deadly weapon; murder committed while lying in wait; murder in the course of committing aggravated robbery; murder for pecuniary gain; knowingly creating a grave risk of death to another person while committing murder (Mr. Bobby Stephens); and murder for the purpose of avoiding or preventing lawful arrest.  The result of the Colorado Supreme Court does not conflict with federal law.

The motion to expand the COA was considered and is denied.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge