TYMKOVICH, Circuit Judge,
concurring and dissenting in part.
I agree with the majority on all issues except its conclusion Littlejohn’s counsel may have failed to meet Strickland requirements for ineffective assistance of counsel. In my view, counsel’s performance was neither deficient nor prejudicial. But more fundamentally, I disagree with the majority’s conclusion that counsel’s failure to develop additional neurological evidence'—even when a constitutionally adequate mental health mitigation defense was presented at trial—requires habeas relief. I therefore respectfully dissent.
To show ineffective assistance of counsel, Littlejohn “has the twofold burden of establishing that (1) defense counsel’s performance was deficient, i.e., counsel’s ‘representation fell below an objective standard of reasonableness’ as measured by ‘prevailing professional norms,’ and (2) defendant was prejudiced thereby, i.e., ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” United States v. Rushin, 642 F.3d 1299, 1302 (10th Cir.2011) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
Counsel’s performance in this case was neither deficient nor prejudicial.
As part of the mitigation trial, Little-john’s counsel undertook the following tasks: (1) conducted an adequate investigation of mitigating factors, (2) presented Littlejohn’s mental defects to the jury through expert and lay witnesses, and (3) explained what may have caused those mental defects and how they contributed to the commission of murder. Littlejohn and the majority would add another layer of responsibility—counsel has a constitutional obligation to articulate from a neurological/psychiatric perspective additional potential physical brain damage.
*870 Strickland imposes no such requirement. While applicable Supreme Court and Tenth Circuit precedent requires capital defense counsel to present evidence relating to a defendant’s mental health where relevant, none go so far as to enshrine the neuro-psychiatric approach now advocated by the majority opinion as the only acceptable lens through which such evidence may be presented. In my view, Littlejohn’s counsel conducted an adequate mental health investigation and elected to present the results through the expert testimony of a developmental psychologist. This choice was well within the bounds of tactical discretion the law gives defense counsel in determining whether and how to present mitigation evidence.
But even assuming for the sake of argument that counsel’s performance was deficient, Littlejohn was not prejudiced by the error. The affidavit submitted by the post-conviction psychiatrist, Dr. Saint Martin, who evaluated Littlejohn for purposes of his habeas petition, offers only the mundane observation that Littlejohn exhibits symptoms “consistent with” a behavioral disorder “caused by neuro-developmental deficits experienced in his perinatal development.” R., Vol. I, pt. 1, at 170, 172. Dr. Saint Martin underscores the ambiguity of his observations with a disclaimer that “the specifics of these ‘wiring’ problems are not yet well understood.” Id. at 171. While suggestive of another approach to mental health evidence, his observations do not fundamentally undercut the approach actually taken. Moreover, such testimony, if believed, would constitute a double-edged sword—while it might reduce Littlejohn’s moral culpability in the eyes of a jury, it could strengthen a jury’s concerns about future dangerousness, since it would suggest Littlejohn could not control his behavior.
I.

Counsel’s performance was not deficient

The majority identifies two flaws in Litt-lejohn’s counsel’s performance. First, it finds counsel did not conduct an adequate investigation of Littlejohn’s mental health pathologies. Second, and more alarmingly, it concludes the failure to develop additional mental health evidence linked to “organic brain damage” was inherently both deficient and prejudicial.
I disagree on both points.
Defense counsel in a death penalty sentencing trial is required to conduct a reasonable investigation of mitigating evidence. Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009). What constitutes a reasonable investigation is judged by “prevailing professional norms.” Rompilla v. Beard, 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). “In judging the defense’s investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to ‘counsel’s perspective at the time’ investigative decisions are made, and by giving a ‘heavy measure of deference to counsel’s judgments.’” Id. at 381, 125 S.Ct. 2456 (citations omitted) (quoting Strickland, 466 U.S. at 689, 691, 104 S.Ct. 2052). Basic expectations for such an investigation include reviewing prison, educational, and medical records, as well as attempting to contact and interview family members. See id.; Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 18, 175 L.Ed.2d 255 (2009). Where there are signs that a defendant may suffer from a mental defect, a mental health evaluation is generally required. See Anderson v. Sirmons, 476 F.3d 1131, 1143 (10th Cir.2007). But it is not our job to second guess a reasonable mitigation strategy, even where the passage of time or the retention of new ex *871 perts suggest better ways to package a mental health defense.[1]
Applying the teachings of the Supreme Court, I find counsel’s investigation was adequate. First of all, counsel hired Dr. Wanda Draper, a former professor at the University of Oklahoma School of Medicine. Dr. Draper, a psychologist with a doctorate in child development, interviewed Littlejohn and reviewed his court records, prison records, medical records, and school records in preparation for her testimony. She met personally with Litt-lejohn for a mental-health evaluation and determined that he was of average intelligence and was not mentally ill. She did determine, however, that Littlejohn suffered from a behavioral disorder that made it difficult for him to fully control his behavior in some circumstances. She also interviewed Littlejohn’s mother, grandmother, and sister to gain a better understanding of the circumstances of Little-john’s upbringing. There is no evidence that this investigation was rushed or that Dr. Draper was precluded from developing any relevant evidence.
Nevertheless, Littlejohn and the majority argue the investigation was inadequate because counsel did not specifically order a psychiatric or neurological evaluation. The cases they rely on for this argument, however, do not support the notion that a psychological evaluation, such as that conducted by Dr. Draper, is constitutionally insufficient. In those cases, defense counsel procured no mental health evaluation whatsoever. See, e.g., Sears v. Upton, — U.S. -, 130 S.Ct. 3259, 3264, 177 L.Ed.2d 1025 (2010) (“[T]he cursory nature of counsel’s investigation into mitigation evidence—limited to one day or less, talking to witnesses selected by [Sears’s] mother—was on its face ... constitutionally inadequate.” (alteration in original) (quotation marks omitted)); Porter, 130 S.Ct. at 453 (2009) (“Counsel thus failed to uncover and present any evidence of Porter’s mental health or mental impairment, his family background, or his military service.”); Anderson, 476 F.3d at 1143 (“Anderson was not evaluated by any mental health or other expert qualified to ascertain whether Anderson suffered from neurological or other deficits that would mitigate his moral culpability.” (emphasis added)). Here, Dr. Draper’s investigation was far more comprehensive and thorough.
While there may be some mental conditions for which a psychological evaluation—as opposed to a psychiatric evaluation-—is insufficient, this is not one of those cases. Littlejohn does not argue that Dr. Draper misdiagnosed him or otherwise erred in her evaluation. To the contrary, Dr. Saint Martin arrived at a nearly identical diagnosis: that Littlejohn suffered from “a behavioral disorder.” Thus, this is not a case where a mental health diagnosis, which should have been discovered, was overlooked due to an unqualified evaluator or time constraints. See Dunlap v. Clements, 476 Fed.Appx. 162, 166-67 (10th Cir.2012) (unpublished) (“On occasion, the Supreme Court has condemned an attorney’s failure to thoroughly investigate sen *872 tencing-phase mitigation evidence as constitutionally deficient assistance. But.... [t]hose cases involve inexcusable neglect.”); cf. Wilson v. Sirmons, 536 F.3d 1064, 1085 (10th Cir.2008) (finding constitutional error where an adequate investigation could have allowed an evaluator to confirm a diagnosis of schizophrenia).
Of course, it is possible that Littlejohn’s counsel could have procured an evaluation from Dr. Draper and a psychiatrist like Dr. Saint Martin. The law recognizes, however, that at some point additional investigation results in diminishing returns. See Strickland, 466 U.S. at 699, 104 S.Ct. 2052 (“Counsel’s strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable.”). In any given case, “there [are] any number of hypothetical experts ... whose insight might possibly have been useful.... Counsel [is] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011); see also Dunlap, 476 Fed.Appx. at 167 (“Lawyers often disagree on trial strategy, a fact disregarded in the vast number of ineffectiveness claims.”). Here, Littlejohn’s counsel reasonably could have concluded that additional mental health evaluations could “be expected to be only cumulative, and ... distractive from more important duties.” Bobby, 130 S.Ct. at 19. And, in fact, this conclusion is borne out by the evidence before us: Dr. Saint Martin’s evaluation resulted in a similar, if not virtually identical, diagnosis as Dr. Draper’s.
In the end, I cannot' agree that the failure to develop additional evidence of organic brain injury was required in this case. “There are ... countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. Rare are the situations in which the ‘wide latitude counsel must have in making tactical decisions’ will be limited to any one technique or approach.” Harrington, 131 S.Ct. at 788-89 (citation omitted) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Therefore, courts apply “a ‘strong presumption’ that counsel’s attention to certain issues to the exclusion of others reflects trial tactics rather than ‘sheer neglect.’ ” Id. at 790 (quoting Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam)). In particular, “the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.” Boyle v. McKune, 544 F.3d 1132, 1139 (10th Cir.2008). This inquiry into the reasonableness of counsel’s decisions is an objective one; even if additional evidence could have supported a defense argument, courts are not supposed to find ineffective assistance on that basis if they “conclude that a competent attorney might elect not to use it.” Harrington, 131 S.Ct. at 789 (emphasis added).[2]
*873 In the course of her evaluation, Dr. Draper found that Littlejohn did not suffer from a severe mental disorder. She also found that he was of average intelligence. But, she did diagnose him with a behavioral disorder, which she characterized as an “emotional disturbance” that created a reduced capacity to control his actions and empathize with others. Dr. Draper surmised that this emotional disturbance was a result of Littlejohn’s early life experiences, including his mother’s prenatal substance abuse, as well as neglect by his mother, father, and grandmother. Counsel decided to humanize Littlejohn with this evidence in the hope of generating enough sympathy from the jury to negate the government’s case for death.
At trial, Dr. Draper testified that Little-john’s behavioral development was negatively impacted by several factors. First, she testified that his mother’s substance abuse during pregnancy negatively impacted his development, though she did not explain at length the physical mechanism by which this occurred. She then walked through various stages of Littlejohn’s upbringing, and explained in detail how the severe neglect he experienced resulted in an inability to trust others and control his impulses. On cross-examination, she admitted Littlejohn was not mentally ill, but diagnosed his condition as “emotional disturbance.” 2000 Tr., Vol. VI, at 133. She also admitted he was able to “distinguish between reality and fantasy.” Id. While Dr. Draper’s testimony focused more on Littlejohn’s upbringing than on his exposure to prenatal substance abuse, she did clearly bring that abuse to the jury’s attention. Those facts were also separately communicated to the jury by Littlejohn’s mother during her testimony.
Dr. Saint Martin’s testimony would have added little to the evidence already before the jury. His affidavit, in summary, establishes three major points: (1) Littlejohn has a behavioral disorder; (2) Littlejohn’s disorder is “consistent with neurodevelop-mental deficits experienced in his perinatal development”; and (3) “[sjtudies demonstrate” that such deficits are “corre-lat[ed]” with observable effects “at the level of the synapse,” with the caveat that “the specifics of these ... problems are not yet well understood.” I understand this to mean that Littlejohn’s prenatal substance abuse and upbringing may have contributed to his anti-social behavior later in life, and that such abuse also may have had some physically detectable, albeit ill-defined, impact on Littlejohn’s brain cells.
Dr. Draper’s testimony had already established the first two propositions advanced by Dr. Saint Martin; Littlejohn suffered from a behavioral disorder caused by his exposure to prenatal substance abuse and the neglect he experienced throughout his childhood. Thus, the only significant addition in Dr. Saint Martin’s affidavit is the third point: the articulation of a certain pattern of brain activity correlated with prenatal substance abuse. But as everyone who has ever taken a statistics class learns, “correlation and causation are two different things.” Arredondo v. Locklear, 462 F.3d 1292, 1301 (10th Cir.2006); see also Norris v. Baxter Healthcare Corp., 397 F.3d 878, 885 (10th Cir.2005) (“A correlation does not equal causation.”). Dr. Saint Martin’s affidavit, on its face, *874 does not purport to provide, with anything approaching scientific confidence, a missing causal link between Littlejohn’s prenatal exposure to alcohol and his mental defects.
But even if Dr. Saint Martin’s affidavit did provide a definitive causal link, there is no support in law for the proposition that additional testimony on prenatal neurological development is necessary for a jury to grasp the causal link between prenatal drug exposure and brain damage. It is common knowledge that pregnant women are not supposed to drink alcohol, smoke, or use drugs because doing so may harm the fetus. It is likewise common knowledge—or common sense—that this harm is accomplished by a physical mechanism, that is, the fetus is physically exposed to substances in the mother that harm it. And, in fact, Dr. Draper explained this, testifying that “because of the passage of nutrients through the placenta, there’s a great deal of concern about the use of drugs and alcohol, particularly, in the mother.” 2000 Tr., Vol. VI, at 91 (noting that “alcohol and substance abuse does impact the developing fetus,” id. at 89). She also testified that Littlejohn was hospitalized at birth in part because of his mother’s prenatal exposures. Further scientific explication of the specific biological pathways may have been interesting, and even may have lent an air of authoritativeness, but was by no means necessary to explain the idea: mother ingests substance, substance reaches fetus, substance harms fetus. The harm to Littlejohn and its resulting influence on his future behavior was the very point of Dr. Draper’s testimony.
To be sure, it is important for the expert to articulate the type of harm the substance causes. But here, Dr. Draper did exactly that—she identified the harm as a failure to develop normally, which, combined with childhood neglect, resulted in a behavioral disorder. That is essentially the same harm identified by Dr. Saint Martin.
The majority points to Rompilla, 545 U.S. 374, 125 S.Ct. 2456, and Sears, 130 S.Ct. 3259, arguing they require us to remand when counsel fails to explain the biological mechanisms underlying a defendant’s mental disorder. But while they address the same general issues as the present case—mental health investigation and presentation of mitigation evidence— the factual particulars are almost completely opposite.
First, in Rompilla, counsel failed to present any mental health evidence, even when it was readily and easily developable. And in Sears, counsel’s investigation was blatantly inadequate—counsel failed to conduct any mental health testing, and then failed to inquire into Sears’s abusive upbringing. See id. at 3264-65. The unreasonableness of the investigation itself casts serious doubt on the reasonableness of counsel’s trial strategy. See id. at 3265 (“[A]ny finding with respect to the reasonableness of the mitigation theory counsel utilized ... is in tension with the trial court’s unambiguous finding that counsel’s investigation was itself so unreasonable as to be facially unconstitutional.”).
Here, in contrast, counsel’s investigation was more than adequate. Counsel investigated Littlejohn’s troubled past and procured a mental health evaluation that uncovered evidence of a behavioral disorder. Littlejohn’s subsequent evaluation by Dr. Saint Martin does not indicate that he was misdiagnosed by Dr. Draper. Thus, unlike in Sears, the investigation supports rather than undermines the reasonableness of counsel’s trial strategy.
And, moreover, Sears suffered from severe mental dysfunction. He was “described as severely learning disabled and *875 as severely behaviorally handicapped.” Id. at 3262. In addition to these “gross[ ]” impairments, Sears exhibited something less than a full grasp on reality—a “grandiose self-conception and evidence of [] magical thinking.” Id. at 3264. This evidence paints a graphic picture of an individual significantly more impaired than Littlejohn, who has average intelligence and does not have a severe mental disability, even according to his own experts.
Perhaps most significantly, Sears’s jurors were kept completely in the dark regarding his mental impairments; as far as they knew, Sears was an average individual, with an upbringing that was “stable, loving, and essentially without incident.” Id. at 3261. Littlejohn’s jurors, in contrast, were made well-aware of Little-john’s behavioral disorder, the effects of which were described in detail by Dr. Draper. Whereas the new information about Sears likely would have caused a significant paradigm shift in the minds of most jurors, Dr. Saint Martin’s testimony would have created, at best, a marginal increase in the amount of information available.
Like Sears, the other cases Littlejohn relies on involved defendants with severe mental defects that were totally hidden from the jury. See, e.g., Jefferson v. Upton, - U.S. -, 130 S.Ct. 2217, 2219, 176 L.Ed.2d 1032 (2010) (“[A]s far as the jury knew, Jefferson did not suffer from brain damage or neurological impairment; he had no organic disorders; and his emotional stability, impulse control, and judgment were perfectly normal.” (quotation marks omitted)); Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (“Counsel failed to introduce available evidence that Williams was ‘borderline mentally retarded’ and did not advance beyond sixth grade in school.”); Anderson, 476 F.3d at 1144 (“[Rjather than offering the jury a potential explanation for Anderson’s actions relating to the murders he participated in, trial counsel’s case in mitigation was limited to a simple plea for mercy.”); Smith v. Mullin, 379 F.3d 919, 942 (10th Cir.2004) (“[Evidence of Mr. Smith’s mental retardation, brain damage, and troubled background constituted mitigating evidence-It was patently unreasonable for Mr. Watson to omit this evidence from his case for mitigation.”); see also Porter, 130 S.Ct. at 453 (“Counsel ... failed to uncover and present any evidence of Porter’s mental health or mental impairment... .”).[3]
The majority points to Victor Hooks v. Workman, 689 F.3d 1148 (10th Cir.2012), but that case is also unpersuasive. First, Hooks’s mental defects were more severe than Littlejohn’s. Hooks was mildly retarded, whereas Littlejohn was of average intelligence. On top of that, Hooks’s brain injury was linked to chronic psychotic disorder. As I discussed above, Littlejohn’s post-conviction examination by Dr. Saint Martin did not result in a clear diagnosis of significant brain damage, but only tentative conclusions of possible brain injury. Second, Hooks’s counsel’s preparation was inadequate—the family history and mental health work-up was only perfunctory. Third, unlike in Hooks, Littlejohn’s expert, Dr. Draper, did “connect the dots” from Littlejohn’s mental impairment to his later crimes. She explained the physical mechanism that may have inflicted prenatal injury (albeit not in scientific terms); she explained Littlejohn’s upbringing in detail; and she explained how all these experiences manifested themselves in a behavioral disorder involving poor impulse control—the exact conclusion the majority and Dr. Saint Martin want us to reach and *876 think would be powerful mitigation evidence: “[Littlejohn suffers from a] behavioral disorder manifested by poor impulse control.” R. Vol. I, pt. 1, at 171. An opinion that Littlejohn’s “poor impulse control” was “caused” by one type of mental disorder rather than another is a thin reed on which to hang deficient performance. It certainly does not point to a failure to discover “significant mitigation evidence” as required by the Supreme Court. Sears, 130 S.Ct. at 3266.
The ready differences between the Supreme Court and Tenth Circuit cases and this one strengthen my view “that a competent attorney might elect not to use” evidence of the type proffered by Dr. Saint Martin. Harrington, 131 S.Ct. at 789. Littlejohn’s counsel’s strategy evidently was to evoke the jury’s sympathies by humanizing Littlejohn. Counsel reasonably could have concluded that the less technical developmental-psychology approach offered by Dr. Draper best accomplished this goal. In light of Littlejohn’s rather moderate mental defects, counsel may have concluded that focusing on the biological aspects of Littlejohn’s mental condition would distract or confuse the jury. Counsel may also have believed, particularly in light of Littlejohn’s average intelligence, that the jury would not be overly convinced that neurological injuries'—even if they existed—were sufficiently serious to significantly impair his judgment. Finally, counsel may have been reluctant to present scientific evidence the specifics of which, by Dr. Saint Martin’s own admission, “are not yet well understood.” R., Vol. I, pt. 1, at 171.
While other counsel may have chosen a different approach, I cannot say that Littlejohn’s counsel’s performance was outside the “wide latitude counsel must have in making tactical decisions.” Harrington, 131 S.Ct. at 788-89 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). And the majority’s elevation to a hallowed status certain types of mental health evidence is not required, let alone compelled, by Supreme Court precedent.
II.

Even assuming counsel’s performance was deficient, Littlejohn was not prejudiced

To establish prejudice, Littlejohn “must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence ... against the entire body of aggravating evidence.” Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009). As the Supreme Court recently explained:
[T]he question is not whether a court can be certain counsel’s performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is “reasonably likely” the result would have been different. This does not require a showing that counsel’s actions “more likely than not altered the outcome,” but the difference between Strickland’s prejudice standard and a more-probable-than-not standard is slight and matters “only in the rarest case.” The likelihood of a different result must be substantial, not just conceivable.
Harrington, 131 S.Ct. at 791-92 (citations omitted) (quoting Strickland, 466 U.S. at 693, 696-97, 104 S.Ct. 2052). Littlejohn cannot meet this burden.
As explained above, Littlejohn’s mental defects were not hidden from the jury. Dr. Draper described Littlejohn’s condition, its causes, and its effects on his behavior. It is unlikely that the additional *877 information provided by Dr. Saint Martin would have made any difference, particularly given the tentative nature of his analysis. Indeed, no prejudice has been found in cases where the new information that would have been provided by additional testimony was significantly greater. See, e.g., Knighton v. Mullin, 293 F.3d 1165, 1179 (10th Cir.2002) (“Defense counsel ... did present a great deal of psychiatric evidence at sentencing, although the defense did not do so under the rubric of organic brain damage.”); Humphreys v. Gibson, 261 F.3d 1016, 1021 (10th Cir.2001) (finding new psychiatric testimony of organic brain damage and addiction “essentially cumulative” with prior testimony of depression, severe alcohol abuse and a personality disorder). It is Littlejohn’s burden to show prejudice, and the evidence he marshals does not surmount that hurdle.
The majority’s argument, in essence, is that a more technical presentation of organic brain injury evidence is inherently more persuasive than a more holistic presentation of the kind offered by Dr. Draper. I find no support for this argument in orn-ease law. Nor do I agree that the kind of testimony offered by Dr. Draper is inherently less convincing than the variety offered by Dr. Saint Martin. Some jurors may be swayed by testimony that sounds more technical and scientific; others may be confused or skeptical. It can be a mixed bag. See Frederick Schauer, Can Bad Science Be Good Evidence? Neuroscience, Lie Detection, and Beyond, 95 Cornell L.Rev. 1191, 1210 (2010) (finding the empirical evidence regarding the extent to which juries rely on scientific testimony “decidedly mixed”); Daniel A. Krauss & Bruce D. Sales, The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing, 7 Psychol. Pub. Pol’y & L. 267, 305 (2001) (finding “less scientific” presentation of evidence may be more convincing to jurors); see also Bradley D. McAuliff et al., Can Jurors Recognize Missing Control Groups, Confounds, and Experimenter Bias in Psychological Science?, 33 Law & Hum. Behav. 247, 255 (2009) (“[JJurors may be unable to evaluate statistical and methodological issues in a sophisticated manner.”). Here, the jury was faced with a defendant afflicted with a moderate, but by no means severe, mental disorder. In truth, Dr. Saint Martin’s approach may have been less effective than Dr. Draper’s more humanizing approach in evoking the jury’s sympathies.[4]
Littlejohn’s prejudice argument fails for an additional reason: Dr. Saint Martin’s testimony was a classic double-edged sword that “[t]he jury could have perceived ... as aggravating rather than mitigating.” Wackerly v. Workman, 580 F.3d 1171, 1178 (10th Cir.2009) (quoting Duvall v. Reynolds, 139 F.3d 768 (10th Cir.1998)); accord Dunlap, 476 Fed.Appx. at 166 (“Evidence of mental illness can arouse sympathy and diminish culpability—or it can raise the specter of an irrational, incorrigible predator.”). Evidence of brain defects might have reduced Littlejohn’s culpability somewhat, but also could have strengthened the jury’s finding of future dangerousness, insofar as it suggested Littlejohn’s behavior was beyond his con *878 trol, even if partially treatable.[5] See Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (“[R]eliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury.”); Penry v. Lynaugh, 492 U.S. 302, 324, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“[Defendant’s] mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.”), abrogated on other grounds by Atkins, 536 U.S. at 321, 122 S.Ct. 2242.
And there is no evidence presented here that violence linked to organic brain damage is any more treatable than violence linked to a behavioral disorder. Thus, Littlejohn cannot rely on a claim that a more physiological account of his behavior would have diminished the aggravating effect of the mental health evidence presented.[6]
As a final word, the central flaw in the majority’s analysis is its erection of a categorical invocation of “organic brain injury” evidence as different in kind for purposes of a Strickland analysis. Nothing in the Supreme Court’s cases suggests it is per se error to fail to develop one type of mental health evidence over another. While in some cases, neurological evidence may be more persuasive, in others, such as this one, it would not be. But to give a talismanic quality to one type of mental health evidence without any showing that it is inherently more persuasive to juries than other evidence stretches the cases past recognition and goes far beyond what the Supreme Court requires when reviewing Strickland claims.
Littlejohn’s counsel’s performance was not deficient, and even if it was, Littlejohn was not prejudiced by his counsel’s error. Therefore, I would affirm the district court’s denial of Littlejohn’s ineffective-assistance claim.

. As the Supreme Court said in Bobby v. Van Hook, as is equally true here, "This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins, 539 U.S., at 525, 123 S.Ct. 2527, or would have been apparent from documents any reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). It is instead a case, like Strickland itself, in which defense counsel's 'decision not to seek more’ mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.' " 130 S.Ct. at 19 (some citations omitted).

. Littlejohn points us to an affidavit from his trial counsel stating that his choice not to engage a psychiatric expert was not motivated by strategic considerations. The Supreme Court, however, has instructed us not to look to defense counsel's subjective motivations when determining reasonableness, particularly when counsel only articulates his motivations long after the trial: Although courts may not indulge “post hoc rationalization’’ for counsel’s decisionmak-ing that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.... After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might *873 have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel’s performance, not counsel’s subjective state of mind. Harrington, 131 S.Ct. at 788-89; see also Allen v. Mullin, 368 F.3d 1220, 1240 (10th Cir.2004) (noting the motive trial counsel may have at the habeas stage to " ‘fall on the sword’ in order to derail a death sentence”).

. Even the investigation in Wilson, 536 F.3d 1064, was less substantial than the one here.

. Even to the extent some of our cases accentuate the difference between mental impairments generally and physical brain damage in particular, see Victor Hooks, 689 F.3d at 1207, Wilson, 536 F.3d at 1094, nothing was presented in this case that would show an Oklahoma jury would view one type of evidence more credible and persuasive than the other. Without more, I cannot presume trial counsel should have done more, or that if he did it would have generated convincing testimony.

. Unlike Smith, 379 F.3d at 943 n. 11, this case is not one in which the defendant can argue the "aggravating 'edge' " of the double-edged sword was already before the jury. The aggravating edge here is Littlejohn's inability to control himself. Littlejohn's primary argument is that Dr. Draper’s testimony failed to convince the jury of his lack of self-control. He cannot simultaneously claim that Dr. Draper’s testimony succeeded in convincing the jury of this fact.

. The majority seems to assume in general that organic brain injuries are treatable, but that behavioral disorders are not (or at least less so). I have no basis to make that assumption, and my guess is that the vast majority of mental health disorders are at least treatable in part. But I do not think the cases support a categorical presumption that juries are likely to be more sympathetic to a "treatable” physical brain injury than a "treatable” behavioral disorder.